856 So.2d 1011 (2002)
FLORIDA POWER & LIGHT COMPANY, a Florida corporation, Appellant,
v.
Walter GOLDBERG, and Rosalie Joy Goldberg, as Co-Personal Representatives of the Estate of Jill Heather Goldberg, Deceased, Appellees.
No. 3D00-63.
District Court of Appeal of Florida, Third District.
May 22, 2002.
Opinion Granting Rehearing October 1, 2003.
Hicks, Anderson & Kneale and Mark Hicks, Miami; FPL Law Department and Aimee Fried, for appellant.
Grossman & Roth; Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin and Joel D. Eaton, Miami, for appellees.
Before COPE, GODERICH and SHEVIN, JJ.
Opinion Granting Rehearing En Banc October 1, 2003.
SHEVIN, Judge.
Florida Power and Light Company ["FPL"] appeals a final judgment and an order denying its motion for new trial in the Goldbergs' wrongful death action. We *1012 affirm the order denying new trial, but remit the awarded damages.
The trial court's order denying FPL's new trial motion fully sets out the facts and arguments justifying the denial of a new trial in this case. The order finds as follows:
FACTS
The defendant, Florida Power and Light, is a public utility in the business of supplying electric power throughout South Florida. It is undisputed that it has the obligation to maintain and repair power lines.
On August 19, 1997, Peter Lombardi, the Village of Pinecrest manager, contacted FPL and spoke with Greg Cope, the commercial account liaison between FPL and the Village. Mr. Lombardi requested that FPL, notify him when the power was going to be turned off, when it was "a planned outage where the company knew in advance they [sic] were going to turn off the power to effect some kind of repairs or maintenance to the system." (Tr. 148). Mr. Cope agreed to pass along the request to the department heads. On September 5, 1997, a week before the fatal accident involved here, Mr. Lombardi met with Mr. Cope and another FPL representative. Mr. Cope agreed to notify the Village of any outages "where FP & L would be turning off the power themselves." (Tr. 152). Based on these conversations and meetings, Mr. Lombardi expected "to be notified in the event that FP & L was going to be turning off power within the Village of Pinecrest." (Tr. 153).
On August 25, 1997, an FPL repairman, Ray Woodard, responded to a call at the residence of Donna Fishbein located at 6725 Southwest 122nd Drive, Miami, Florida. Thus, on the day of the accident, Mr. Woodard was aware that this location is a gated house with a wall surrounding the entire property.
On Friday, September 12, 1997, as a result of a storm, a high voltage electric line came down in the rear of the Fishbein residence. Donna Fishbein called 911. The Pinecrest Police Department sent Officer Laricci at approximately 2:00 p.m. The same repairman, Ray Woodard, also responded and was able to establish that the line was de-energized. FPL sent six trucks and seven repair people to repair the problem. At approximately 3:00 p.m., the FPL personnel informed Officer Laricci that he was no longer needed.
To insure the safety of the repairmen, they decided to open the fuse to a pole located 100 to 150 feet from the light that controls the intersection of 67th Avenue and 120th Street, one of the major intersections in the Village of Pinecrest. At 4:42 p.m., the defendant's employee opened the fuse and killed the power to the traffic signal. Mr. Woodard claimed not to know that the fuse controlled the traffic signal, but there was ample evidence that he should have known. At the base of the pole on the ground, there was a five foot concrete slab and in the middle, there was a metal plate with large letters reading "TRAFFIC SIGNAL." On the pole, eight feet off the ground, there was a gray metal box with a switch, which Mr. Woodard knew controlled the traffic light. As you climbed the pole, you could see the wires run from the pole to the traffic light.
Jill Goldberg was a passenger in a car driven by her mother, Rosalie Goldberg. They were driving home from the Falls. It was dusk and it was raining. The uncontroverted testimony was that Jill was a beautiful, twelve-year old, straight A student in the gifted program at Pinecrest *1013 Elementary. She had just started as a student at Palmetto Middle School.
Shortly after five p.m., Mrs. Goldberg was driving north on 67th Avenue following a line of cars, none of which were stopping at 120th Street. A Ford Expedition pulled out slowly, trying to find a gap in the line of traffic. The vehicle clipped the left rear of the Goldberg vehicle, causing it to rotate and slide in a northbound direction, into the southbound lane of travel. A Chevy Suburban ran into the passenger side of the Goldberg vehicle.
U.S. Attorney Thomas Scott was driving home when he heard the impact and pulled behind the two cars. He found Jill Goldberg wedged on the passenger side and Mrs. Goldberg dazed behind the steering wheel. After pulling out Mrs. Goldberg, Mr. Scott returned to Jill, who was bleeding from the mouth, her eyes open, alive and conscious. He kept her head up to prevent choking, and waited for Fire Rescue, staying until Jill was airlifted to the trauma center at Jackson Memorial Hospital. She died the next day.
The plaintiffs, Walter Goldberg and Rosalie Goldberg as personal representatives of the Estate of Jill Goldberg, filed a complaint for wrongful death and negligence. After a week-long trial, the jury awarded the plaintiffs approximately $37 million in damages. The defendant improperly contacted three of the jurors, including the foreman, in an apparent effort to find fault with the verdict. The Third District issued a writ of certiorari preventing the plaintiff from conducting discovery on this impropriety.
Defendant's Motion for Judgment in Accordance with Motion for Directed Verdict
A motion for directed verdict should be granted when there is no reasonable evidence upon which a jury could legally predicate a verdict in favor of the non-moving party. Ameriseal of N.E. Fla., Inc. v. Leiffer, 24 Fla. L. Weekly D1685[, 738 So.2d 993] (Fla. 5th DCA July 16, 1999). In Warshall v. Price, 629 So.2d 903, 904 n. 2 (Fla. 4th DCA 1993), the court stated:
A trial court may properly direct a verdict only when, viewing the evidence (and all reasonable inferences which could be drawn therefrom) in the light most favorable to the non-movant, there is no room for reasonable minds to differ and the movant is clearly entitled to judgment as a matter of law.
Duty
Defendant argues, as it has throughout these proceedings, that it owes no duty to the general public under the common law for traffic signals which are rendered inoperable. Defendant further argues no contractual duty exists with the Village of Pinecrest because the traffic signal was inadvertently de-energized during the performance of an emergency restoration work and not during a scheduled power outage which was the subject of the agreement.
Plaintiffs argued that the defendant had assumed a common law tort duty to motorists as a result of the agreement with the Village of Pinecrest to notify them of scheduled power outages. Taking the evidence in the light most favorable to the plaintiff, there was evidence to support a finding that the signal was turned off by disregarding a lid that read in large letters "TRAFFIC SIGNAL." Furthermore, the line fed directly into the intersection, arguably visible to the defendant's repairman.

*1014 The element of duty in negligence focuses on whether a defendant's actions created a foreseeable zone of risk that poses a general threat of harm to others. McCain v. Florida Power Corp., 593 So.2d 500, 502 (Fla.1992). The issue of duty is an issue of law. Id. Once it is established that a duty does exist, only then does the issue of proximate cause become relevant. Florida Power & Light Co. v. Periera, 705 So.2d 1359, 1361 (Fla.1998). "The issue of proximate cause is generally a question of fact." Id. As McCain stated, duty "is a minimal threshold legal requirement for opening the courthouse doors, whereas [proximate cause] is part of a much more specific factual requirement that must be proved to win the case once the courthouse doors are open." 593 So.2d at 502. (footnote omitted).
One who undertakes to act, even when under no obligation to do so, must perform in accordance with a duty to exercise reasonable care. Union Park Mem'l Chapel v. Hunt[Hutt], 670 So.2d 64, 67 (Fla.1996); Priester v. Grand Aerie of the Fraternal Order of Eagles, Inc., 688 So.2d 376, 378 (Fla. 3d DCA 1997). This voluntary undertaking to do an act that might increase a risk of harm to others confers such a duty because it creates a foreseeable zone of risk. Union Park Metn't[Mem'l] Chapel v. Hutt, 670 So.2d at 67.
Another way of framing the issue of duty is to ask whether a defendant stood in a relation to the plaintiff as to create any legally recognized obligation of conduct for the plaintiffs' benefit. Palm Beach-Broward Med. Imaging Or.[Cr.] Inc. v. Continental Grain Co., 715 So.2d 343, 344 (Fla. 4th DCA 1998). Where a defendant's conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon a defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses, Kaiser[Kaisner] v. Kolb, 543 So.2d 732, 735 (Fla.1989).
The leading case regarding a duty of a public utility based on common law tort is H.R. Moch Co. v. Rensselaer Water Co., 247 N.Y. 160, 159 N.E. 896 (1928), authored by Chief Justice Cardozo. The court held that a failure of a utility to supply adequate water is not a wrongdoing but at most is a denial of a benefit. Id. at 898. The Moch court explained that a duty can be gratuitously assumed. Such a duty arises "if the conduct has gone forward to such a stage that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively working an injury." Id. In other words, the utility must have such a relationship with a plaintiff that it adversely affects an interest of the plaintiff as opposed to failing to confer a benefit upon a plaintiff.
There are very few Florida cases regarding a common law tort duty by a utility. It is well noted that a mistaken interruption in electrical power is insufficient to state a cause of action in gross negligence against a utility company. Landrum v. Florida Power & Light Co., 505 So.2d 552, 554 (Fla. 3d DCA 1987). For example, in Arenado v. Florida Power & Light Co., 523 So.2d 628, 629 (Fla. 4th DCA 1988), the court found that a utility company did not assume a common law tort duty to a motorist involved in an auto accident caused by a utility line going down which de-energize the traffic signal. In Abravaya v. Florida Power & Light Co., 39 Fla. Supp. 153 (Dade Cty. Ct.1973), the court found that the plaintiff was not a customer of the utility. Id. at 157. The utility had no duty to regulate the flow of traffic for the municipality. Id. The court further *1015 found that if it should determine that a utility should bear the risk, the decision would have far reaching consequences. The power company would have to bear the burden for traffic accidents in the event of signal failures quite remote from the duty imposed by a municipal contract. Id. at 158.
Florida cases also rely on New York cases in this area of duty. In Shubitz v. Consolidated Edison Co., 59 Misc.2d 732, 301 N.Y.S.2d 926 (1969), an electric company owed no duty to a tenant who was injured in an apartment building during a blackout. The tenant was not a customer of the utility. In response to maintaining an action in common law tort, the court stated that even if a utility was negligent in failing to deliver electrical current, the failure of such circumstances is a denial of a benefit, not the commission of a wrong. Id. at 929. Further in Strauss v. Belle Really[Realty] Co., 98 A.D.2d 424, 469 N.Y.S.2d 948, 951 (1983), an electric power system malfunctioned causing a blackout. A tenant in an apartment building was injured. The court found the complaint did not state a cause of action against the utility for gross negligence or as a third party beneficiary. Id. The utility owed no duty to the tenant. Id.

In contrast, in Hall v. Consolidated Edison Corp., 104 Misc.2d 565, 428 N.Y.S.2d 837 (1980), a tenant was a direct customer of the utility and not merely a member of the general public. The tenant was injured when the utility shut off power to the hallway of the apartment building. Before the utility shut off power, it inquired as to the potential hazard of the shutdown. The court found that the utility was grossly negligent based on its common law duty to act reasonably in shutting off the power. Id. at 840. The utility intentionally shut off the power and was aware that by terminating electricity, it would be unsafe for the tenant to egress from the building. Id. And in Perez v. New York City Housing Auth., 114 Misc.2d 1055, 452 N.Y.S.2d 510, 515 (1982), the court held that the utility had a common law tort duty to a tenant which was injured in a building during a blackout. The court found that the utility had obligated itself to service the building and inextricably involved itself with the tenant. Further the utility had realized that its failure to maintain its facilities would adversely affect the tenant. The utility's failure to act did not merely withhold a benefit from the tenant but actively created a duty to the tenant.
Another basis for finding that a utility has a duty is under a contract which has a specific provision evidencing the utility's intention to compensate the public. Arenado v. Florida Power & Light Co., 523 So.2d at 629. The Arenado court quoted from Moch as follows:
In a broad sense it is true that every city contract not improvident or wasteful, is for the benefit of the public. More than this, however, must be shown to give a right of action to a member of the public not formally a party. The benefit, as it is sometimes said, must be one that is not merely incidental and secondary.... It must be primary and immediate in such a sense and to such a degree as to bespeak the assumption of a duty to make reparation directly to the individual members of the public if the benefit is lost.
159 N.E. at 897.
The evidence at trial in this case supports a finding that this intersection collision occurred when the traffic signal was intentionally rendered inoperable to *1016 conduct non-emergency repairs. The employees of defendant were responding to a downed power line. They disconnected a fuse of a pole 100 to 120 feet from the intersection that operated the traffic signal.
The evidence was contradictory as to whether the repair to the line was of the type envisioned in the agreement between the Village of Pinecrest and the defendant. According to the defendant, the repairs here were not covered under the agreement because it was an emergency power restoration, not a scheduled prearranged repair. The jury and the court heard the evidence of what the agreement had been by listening to the testimony of Village personnel and defendant's representatives. The evidence was conflicting but, if taken in the light most favorable to the nonmoving party, it supported the conclusion that the repairs here were covered by the agreement. In fact, a police officer had responded to the 911 call, only to be sent away by the FPL repairman.
It is undisputed that the Village of Pinecrest was never notified that the power would be shut off by defendant's employees. Likewise, the defendant did not dispute that, if the Village had been notified, it would have dispatched police to direct traffic or placed temporary stop signs. It would be different if power was out due to an act of God or emergency power interruption. However, if the power was intentionally shut down, the Village expected to be notified. The Village's request to be notified was limited to when the defendant turned off the power, a planned outage where the defendant knew in advance they would be turning off power to effectuate repairs then the Village should be notified.
The defendant's failure to warn created a reasonable foreseeable zone of risk to others and will not be sanctioned as a matter of law, The court finds that, even if there was no common law tort duty, there was sufficient evidence of a contractual duty imposed on the defendant by the oral agreement with the Village of Pinecrest for it to deny the motion for directed verdict.
Breach of Duty/Proximate Cause
The duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader "zone of risk" that poses a general threat of harm to others ... The proximate causation element, on the other hand, is concerned with whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred. In other words, the former is a minimal threshold legal requirement for opening the courthouse doors, whereas the latter is part of the much more specific factual requirement that must be proved to win the case once the courthouse doors are open.
McCain v. Florida Power Corp., 593 So.2d 500, 502 (Fla.1992). The supreme court further noted:
Unlike in the "duty" context, the question of foreseeability as it relates to proximate causation generally must be left to the fact-finder to resolve. Thus, where reasonable persons could differ as to whether the facts establish proximate causationi.e., whether the specific injury was genuinely foreseeable or merely an improbable freak then the resolution of the issue must be left to the fact-finder.... The judge is free to take this matter from the fact-finder only where the facts are unequivocal, such as where the evidence supports no more than a single reasonable inference. *1017 McCain, 593 So.2d at 504 (emphasis added).
If an intervening cause is foreseeable, the original negligent actor may still be held liable. The question of whether an intervening cause is foreseeable is for the trier of fact. Palm Beach County Bd. Of Com'rs v. Salas, 511 So.2d 544, 547 (Fla.1987); Gibson v. Avis Rent-A-Car System Inc., 386 So.2d 520, 522 (Fla.1980). An intervening cause is unforeseeable only if it constitutes an improbable freak. McCain v. Florida Power Corp., 593 So.2d at 504. These principles are applicable to the original act of negligence by a utility company's disabling a traffic signal.
In Adoptie v. Southern Bell Tel. & Tel. Co., 426 So.2d 1162 (Fla. 3d DCA 1983), a utility company was not held liable for injuries sustained due to an inoperable traffic signal to a motorist whose employees had cut the line. This case does not help the defendant, however, "because the authorities charged with maintenance of the light ... had actual or constructive notice that the power line had been cut and a period of about forty days passed before the accident in question occurred." (Nesbitt, J., concurring). Of greater assistance to the defendant is Derrer v. Georgia Elec. Co., 537 So.2d 593 (Fla. 3d DCA), rev. denied, 545 So.2d 1366 (Fla.1989). There the court affirmed a judgment notwithstanding the verdict entered in favor of the power company. The court agreed that the inoperable signal:
was a cause-in-fact of the aforesaid collision because arguably the female plaintiff would have seen the traffic control signal in question had it been operating, would have realized that she was approaching an intersection, and, consequently, might have avoided hitting the automobile which entered the intersection from her left. We conclude, however, that her oblivious behavior in not realizing she was entering an intersection was not a reasonably foreseeable consequence of the defendant's negligence in causing the traffic light to become inoperable. Surely, inoperable intersectional traffic lights do not, in the range of ordinary human experience, cause automobile drivers to miss seeing the entire intersection where the light is located; such a bizarre occurrence is, in our view, beyond the scope of any fair assessment of the danger created by the inoperable traffic light. This being so, the trial court correctly concluded that the defendants' negligence herein was not a proximate cause of the plaintiffs' injuries.
537 So.2d at 594.
First, Derrer predated McCain. Thus, the court does not explain why the issue of proximate causation, an issue generally left to the fact-finder, was removed from their ambit. Second, the evidence in the instant case was that all the north-south vehicles were proceeding single file, without stopping, through the intersection. Witnesses here testified that the intersection was dangerous and that previous accidents had occurred at this intersection when the traffic light had gone out. Finally, in Derrer the trial court had granted the defendant's motion for judgment notwithstanding the verdict. The trial judge in the instant case is not prepared to find that as a matter of law the accident was a "bizarre occurrence." On the contrary, it was entirely foreseeable that after the defendant cut off the power during the late evening rush-hour traffic, and given the weather conditions, that most motorists would have trouble seeing the entire intersection. (Emphasis added).

*1018 The evidence as a matter of law does not establish that the motorists' negligence was a superceding cause and that any alleged negligence by defendant did not proximately cause the accident. The evidence taken in the light most favorable to the plaintiffs established that defendant created a hazard and failed to warn or protect motorists when turning off traffic signals by calling police, directing traffic or using flashers on its trucks. Three weeks prior to the accident, an employee of defendant worked on wires behind a nearby residence where the problem developed on the day of the accident. On the day of the accident there was a downed power line down due to lightning at that residence. The fuse to that line did not cause the power outage to the traffic signal. Defendant's employee previously had told a police officer who was at the residence that his assistance was not needed. Then defendant's employees planned how to handle the situation. They knew at that point that the fuse controlling the down power line was de-energized, but as a safety precaution to themselves, they de-energized the line feeding the traffic signal. This was done to eliminate a backfeed and prevent their own injury. They had to go outside the Feinberg residence to make sure the power was off and find the transformer and fuse. The employee went to the pole and failed to see the metal plate or signal box that said "TRAFFIC SIGNAL." He had an unobstructed view of the traffic signal to the north but never looked. He opened the second fuse to the second line that ran parallel to the down power line and the traffic signal went out. He never checked to see if the traffic signal was affected.
From this evidence the jury could easily conclude that defendant negligently caused the power outage to the traffic signal. Additionally, there was ample evidence to support the jury's finding that the traffic signal's inoperability was the proximate cause of the collision.
On the day of accident, there were two crash events. The first crash occurred between Mrs. Sollie and the plaintiffs. The second crash occurred between the plaintiffs and a third party. The evidence established that environmental factors also played a role in the cause of the accident. It was the middle of rush hour.
As to proximate cause, the accident reconstructionist indicated the primary cause of the first accident.
Q. Please tell the jury if this traffic light was working whether ... there was anything else that you would lay the blame on for this accident?
A. My opinion is that the traffic light being inoperable was the primary initiating cause of the event.
(Tr. 359). The court finds that this was not a freak accident but was entirely foreseeable.
Defendant's Alternative Motion for New Trial
Accusation of Discovery Misconduct Does Not Warrant a New Trial
Defendant claims the plaintiffs made an improper closing argument that suggested defendant engaged in discovery misconduct by hiding unfavorable testimony of J.J. Van Riel. Plaintiffs contend that the comments made in rebuttal does not warrant a new trial. In rebuttal, the closing argument by Mr. Yaffa was as follows:
Mr. Yaffa: Which was it, Ray? Did you look or was it covered? You know the truth. You know the truth because you spoke to him the next day. It wasn't covered.

*1019 That's why there were no pictures taken. That's why they didn't bring this gentleman, J.J. in here to talk to you.
Ray told you on the stand that when they heard the crash he began to look for J.J. "Where was J.J.?"
J.J. went back to the pole, and the reason he went back to the pole was to put the fuse back in once the line was raised.
J.J. would know the status of the pole. He would know the status of the leaves on the ground and was the box covered.
Where is he? He's not here because he knows the truth. They never produced him for deposition.
[Defense counsel] Mr. Dugan: Let me just object, Your Honor. This is way beyond the evidence in the trial.
The Court: This is argument.
[Plaintiffs' counsel] Mr. Yaffa: They never brought him to us, and they never brought him to you because he knows the truth and they know the truth.
(Tr. 867).
Where counsel accuses another counsel of discovery misconduct in front of the jury to persuade the jury that counsel was concealing evidence or committing a fraud and where no pretrial discovery violation was established, a new trial is warranted. Emerson Elec. Co. v. Garcia, 623 So.2d 523, 525 (Fla. 3d DCA 1993). Further, comments by counsel accusing opposing counsel of fabricating and misrepresenting evidence and during rebuttal insinuating opposing counsel had been less than forthright about the evidence is fundamental error. Owens[-]Corning Fiberglas Corp. v. Crane, 683 So.2d 552, 554 (Fla. 3d DCA 1996). However, it is permissible for counsel to point out discrepancies in the evidence introduced at trial. Id. at 555.
A contemporaneous objection to an improper comment in summation is necessary in order to preserve the claim for appellate review, Cedars Medical Ctr., Inc. v. Ravelo, 738 So.2d 362 (Fla. 3d DCA 1999). The exception to this rule is when the comment is so egregious that it constitutes fundamental error. Id. Fundamental error in closing argument occurs when the prejudicial conduct in its collective import is so extensive that its influence pervades the trial, gravely impairing a calm and dispassionate consideration of the evidence and the merits by the jury. Id.

During rebuttal, plaintiffs' counsel argued that the first issue was the pole. He argued to the jury to use common sense. He was commenting on the evidence. Just before the above statement he stated: "This is a case about fairness, and it's not fair that on the one hand he's going to tell you I didn't look, but on the other hand when he's here so that you can judge his actions he says it was covered in leaves." (Tr. 866). Mr. Woodard had seen the pole covered with leaves. The evidence at trial showed that another employee of defendant, J.J. Van Riel had seen the pole and he would know whether it was covered in leaves. However, the defendant did not call him as a witness. Plaintiffs' argument to the jury reflected that an adverse inference could be made from defendant's failure to call Mr. Van Reil as a witness. It does not accuse the defendant of hiding evidence. A counsel can comment in closing argument on a party's failure to testify, Fino v. Nodine, 646 So.2d 746, 751 (Fla. 4th DCA 1994). However, a counsel cannot comment if it is a witness' failure to testify unless availability is shown. Id.

*1020 The plaintiffs point out that during the initial closing argument which was not objected to, it was argued that Mr. Van Reil was not in court. (Tr. 829). The objection made during rebuttal was that the argument was way beyond the evidence at trial. There was no objection that the argument improperly asserted an adverse inference. The court thus finds that the plaintiffs' comments do not accuse the defendant of discovery misconduct or concealing evidence. The comments were made merely to draw an adverse inference which is not fundamental error.
Improper Admission of Plaintiffs' Fuse Pole Photographs Does Not Warrant a New Trial
Defendant contends the court erred in admitting photographs of a fuse pole because the court initially ruled the photographs were taken long after the accident and could not accurately portray the pole and surrounding area. Plaintiff argues that the admission of the photographs of the pole was not an abuse of discretion and any error was harmless.
Florida Statute § 90.403 provides in pertinent part:
Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confession of issues, misleading the jury or needless presentation of cumulative evidence.
Under § 90.403 the determination whether to admit the photographs of the fuse pole involves a balancing of probative value against unfair prejudice. The determination of relevancy is within the discretion of the court. Sims v. Brown, 574 So.2d 131, 133 (Fla.1991). Photographic evidence which is relevant for some legitimate purpose does not become inadmissible in every instance simply because the photographs may depict some post-accident change in the scene surrounding the site of an accident. Pensacola Inn Lid[Ltd.] v. Tuthill, 404 So.2d 1173, 1175 (Fla. 1st DCA 1981). Photographs, though not exactly depicting the scene as it existed at the time of the incident involved, are nevertheless admissible upon a showing of the difference between the photographs and the scene of the relevant time. Musleh v. Division of Admin., State, Dept. of Transp., 299 So.2d 101, 103 (Fla. 1st DCA 1974), In Atlantic Coast Line R. Co. v. Saffold, [130 Fla. 598,] 178 So. 288, 290 (Fla.1938), no harmful error was committed in admitting photographs of an embankment to show the condition of the culverts where although the embankment had changed at the time the photograph was taken, the condition of the culverts had not.
In the instant case, the pole was located 100 to 120 feet south of the intersection. One of the fuses of the pole controlled an overhead power line to the traffic signal. The photographs were shown to the witness who identified the pole. He testified that he did not see the plate at the bottom within concrete. It was covered with leaves and tree foliage. The witness testified that because the foliage had covered the pole he did not see the devices that would have alerted him that he was shutting off the traffic signal. (Tr. 96).
There was a limited purpose for admitting the photographs with curative instruction.
The Court: I will admit it, but I'll instruct the jury that these photographs are being offered just to show what the lid looked like and what the pole looked like, but the foliage may or may not have been the same. In fact, I think the testimony of the witness *1021 Woodard is that it was covered by foliage. With that instruction I will go ahead and admit it.
Mr. Dugan: Your Honor, can I have an opportunity to voir dire the witness then as it relates to this particular issue?
The Court: You may, sure.
Mr. Dugan: Mr. Pivnik, the particular exhibit marked 1A, Plaintiffs' 1A for identification, you see the trees and foliage around that particular pole?
The Witness: Yes, Sir.
Mr. Dugan: You don't know what the condition of the trees and foliage around that particular pole were on the day of this accident, September 12th, 1997. Is that correct?
The Witness.That's correct.
Mr. Dugan: So all you're telling us is that the pole was there and all the attachments you believe were there. Is that a fair statement?
The Witness: Yes. Sir.
Mr. Dugan: But you're unable to testify that because of the condition of the foliage around the pole that the pole, the circuit breaker box or the traffic signal would have been visible to anyone looking at that pole on the day of this accident. Isn't that true?
The Witness: That's true.
Mr. Dugan: Your Honor, then I renew my objection because it's our position introducing this exhibit in its condition with a curative instruction would be unfairly prejudicial because it doesn't accurately reflect what was present to Mr. Woodard at the time of the accident and that's the crucial issue in this case.
The Court: I'll go ahead and admit it with that instruction to the jury that it doesn't necessarily show the condition of the foliage. Just the condition of the pole and the lid.
Mr. Grossman: Okay.
The Court: It's admitted.
(Tr. 211-213).
The photographs were admitted for the limited purpose of demonstrating the condition of the pole and lid and not to show the physical scene. The court indicated that it would be misleading to the jury to admit [sic] to show the physical scene because the scene was not the way it looked on the day of the accident. There was no testimony that the photographs accurately depicted the scene at the time of the accident.
The defendant's witnesses testified that since the day of the accident, the foliage surrounding the pole had been removed. In admitting the photographs the jury was instructed that the photographs were not being admitted to show the condition of the foliage at the time of the accident. Instead the photographs depicted the condition of the pole and access plate on the day of the accident and not the foliage. There was corroborating testimony that no signal work had been done and no changes made at the location since the day of the accident. The plaintiffs were unable to prove the condition of the foliage or that the same foliage existed as on the date of the accident.
What these photographs depicted was cumulative evidence. Several witnesses testified as to the location of the pole, the existence of the traffic signal box and the concrete slab labeled traffic signal. The court holds that no harmful error occurred in admitting the photographs. Metropolitan Dade County v. Coats, 559 So.2d 71 (Fla. 3d DCA), rev. denied, 569 So.2d 1279 (Fla.1990). No harmful error [sic].

*1022 The Jury Verdict Finding the Plaintiffs and Mrs. Sollie Not Negligent is not against the Manifest Weight of the Evidence

Defendant claims the verdict is against the manifest weight of the evidence in that the plaintiffs admitted to violating the traffic laws in failing to stop at the intersection where there is an inoperable traffic signal and in failing to notice the traffic signal indicates some fault on her part. Further, Mrs. Sollie's failure to use due care when entering the intersection following her stop requires a finding of some liability. Plaintiffs argue that the jury was not required to find the two drivers at fault simply because they may have violated a traffic statute.
A verdict is against the manifest weight of the evidence only when it is clear, obvious, and indisputable that the jury was wrong. Uniroyal Tire Co. v. Trujillo, 711 So.2d 606, 609 (Fla. 3d DCA), rev. granted, 727 So.2d 914 (Fla. 1998). As the supreme court reiterated in Brown v. Estate of Stuckey, 24 Fla. L. Weekly S397[, 749 So.2d 490] (Fla. August 26, 1999), the seminal decision in Cloud v. Fallis, 110 So.2d 669 (Fla.1959), governs the broad discretion of a trial judge to grant a new trial when the verdict is contrary to the manifest weight of the evidence. The court, quoting Cloud, wrote:
When a motion for new trial is made it is directed to the sound, broad discretion of the trial judge, who because of his contact with the trial and his observation of the behavior of those upon whose testimony the finding of fact must be based is better positioned than any other one person fully to comprehend the processes by which the ultimate decision of the triers of fact, the jurors, is reached.
When the judge, who must be presumed to have drawn on his talents, his knowledge and his experience to keep the search for the truth in a proper channel, concludes that the verdict is against the manifest weight of the evidence, it is his duty to grant a new trial, and he should always do that if the jury has been deceived as to the force and credibility of the evidence or has been influenced by considerations outside the record.

Cloud, 110 So.2d at 673.
The trial court in the instant case concludes that the jury was not deceived as to the force and credibility of the evidence nor was it influenced by considerations outside the record. A violation of a traffic statute is not negligence per se. Rather the violation of a traffic statute is prima facie evidence of negligence, but that prima facie evidence may be overcome by proof of surrounding circumstances and conditions which will eliminate the character of negligence from the transaction. Allen v. Hooper, 126 Fla. 458, 171 So. 513, 516 (1936). When it is shown that the traffic law has been violated, it is a question for the jury to determine from all the facts and circumstances whether or not the prima facie [evidence] of negligence is overcome by other evidence of existing facts and circumstances. Id. Standard instruction 4.11 advises the jury that a violation of the statute is evidence of, but not determinative of, negligence. Ridley v. Safety Kleen Corp., 693 So.2d 934, 937 (Fla.1996). The instruction provides that violation of a "statute is evidence of negligence. It is not, however, conclusive evidence of negligence. If you find that a person alleged to have been negligent violated such a traffic regulation, you may consider that fact, together with the other facts and circumstances, *1023 in determining whether such person was negligent."
The verdict assessed 100% liability against the defendant and found 0% liability on the part of the motorists, plaintiffs and Mrs. Sollie. The verdict showed that the jury was asked the question of whether there was negligence on the part of the defendant which was the legal cause of the child's death and the jury answered in the affirmative. The jury was also asked whether there was negligence on the part of plaintiffs and Mrs. Sollie and the jury answered in the negative.
The traffic ordinances of Florida Statute §§ 316.1235 (stopping) and 316.1925 (careless driving) were submitted to the jury. The evidence indicated that Florida law requires drivers to stop at an intersection with an inoperable traffic signal. However, a four way stop works if motorists realize that the intersection light is inoperable but many times they do not due to weather or visibility conditions. It is undisputed that at the time of the collision, the traffic signal was "dead" or inoperable in all directions.
Plaintiffs were traveling northbound with on and off [sic] rain and it was overcast. The traffic was heavy going northbound. The plaintiffs were wearing seat belts. Mrs. Goldberg admitted that she had driven through the intersection several times a week and knew that a traffic signal existed at that intersection. She testified that she had encountered inoperable traffic signals and when she saw that it was inoperable, she stopped.
As plaintiffs approached the intersection, Mrs. Goldberg did not see the traffic signal nor ever become aware of its presence. She was following a steady stream of vehicles ahead in the flow of northbound traffic. Mrs. Goldberg did not see the stop bar or the crosswalk lines on the street. She was looking ahead at the stream of vehicles before her. She was not speeding. It is undisputed that she went into the intersection without stopping and never saw Mrs. Sollie. The evidence also indicated that Mrs. Goldberg's view to the left was obstructed by a wall, trees and a pole. The jury heard conflicting evidence as to whether her view of the traffic signal was obstructed. But there was no doubt that her view was affected by weather, left lane traffic, and an obstruction of overhanging branches covering the right side set of traffic signals. She was traveling in the right lane northbound. Her view of the inoperative traffic signal was unobstructed. While the overcast weather condition may have diminished her view, it did not obscure the traffic signal. The evidence was therefore conflicting as to whether Mrs. Goldberg was negligent.
Mrs. Sollie was traveling eastbound and it was drizzling. As she approached the intersection, she had an unobstructed view of the signal, noticed that the traffic signal was inoperable and stopped her vehicle. She was the first vehicle in line. She testified that she did not see any vehicles northbound or southbound and proceeded into the intersection as follows:
Q: After you stopped at the intersection of 120th Street and 67th Avenue, what happened next?
A: I looked to my right, I looked to my left. I looked in front of me, and no cars-I saw no cars and proceeded. (Tr. 736) .......
Q: Did you or do you have any indication at all that the Mercedes was traveling north on 67 Avenue at any time before you actually saw it cross your path and tapped it?

*1024 A: No.
(Tr. 742).
In the intersection, while Mrs. Sollie's vehicle was moving forward, the plaintiffs' vehicle crossed in front of her from the south. Her front bumper tapped the plaintiffs' vehicle's left side. She did not recall anything blocking her vision to the right. She had to inch out to see down to her right. She never saw the plaintiffs.
The accident reconstruction expert testified that the posted speed limit was 35 miles per hour. All three vehicles were traveling within the posted speed limit. Mrs. Sollie from a stopped position had to gain enough speed to make it between the southbound traffic to cross over. When the plaintiffs were struck by Mrs. Sollie, the impact caused the plaintiffs' vehicle to go out of control due to the rain and wet road weather conditions. After the impact the plaintiffs vehicle slid and rotated into the southbound lane to be struck again by a third party on the right hand side. If Mrs. Sollie had stopped at the stop bar, she could not have seen the northbound vehicles and could not have seen the plaintiffs until one second before impact. If she had stopped at the bar and then inched to the crosswalk, from the crosswalk, her view of the northbound vehicles is unobstructed. She could have stopped before striking the plaintiffs' vehicle.
Mrs. Sollie's view of the southbound lane was limited due to the obstruction of a wall, trees and a pole. A witness heading eastbound testified as to heavy traffic southbound coming every few seconds. However, northbound traffic was not too heavy. The eastbound driver testified that the north and southbound vehicles were not stopping. He indicated that the traffic signal was inoperable and he had to wait seven to eight minutes due to rush hour traffic. There is no dispute that Mrs. Sollie complied with the requirement of treating the intersection as a four way stop. The court concludes that the jury was justified in finding that she also made every effort to comply with the right of way requirement.
The verdict was not excessive and against the manifest weight of the evidence
Defendant requests a new trial on damages arguing that the verdict amount of $37,372,000 is excessive, unsupported by the evidence and unduly influenced by passion, prejudice or other matters outside the record. Defendant does not request a remittitur of damages. The plaintiff did not request punitive damages.
As previously discussed, the decision in Cloud v. Fallis, 100[110] So.2d 669 (Fla.1959), governs the broad discretion of a trial court to grant a new trial when the verdict is contrary to the manifest weight of the evidence. Brown v. Estate of Stuckey, 24 Fla. L. Weekly S397[, 749 So.2d 490] (Fla. August 26, 1999). A motion for new trial is granted when the jury has been influenced by extraordinary considerations, misled by force and credibility of evidence, or when verdict fails to comport with [sic] manifest weight of the evidence. Pierce v. Nicholson Supply Co., 676 So.2d 70, 71 (Fla. 2d DCA 1996). A new trial may be ordered on the grounds that the verdict is excessive or inadequate when 1) the verdict shocks the judicial conscience or 2) the jury has been unduly influenced by passion or prejudice. Brown v. Estate of Stuckey, 24 Fla. L. Weekly S397[, 749 So.2d 490] (Fla. August 26, 1999). Such an order granting a new trial must give reasons from the record to support *1025 those conclusions. Hawk v. Seaboard System R.R. Inc., 547 So.2d 669, 671 (Fla. 2d DCA 1989).
Under Florida Statutes § 768.21(l) and (4), parents of a deceased minor child may recover for lost support and services and for mental pain and suffering. In this case because it was a young child and the costs of providing for that child until maturity is higher than any services provided by the child, the award was limited to mental pain and suffering. Williams v. U.S., 681 F.Supp. 763, 764 (N.D.Fla.1988).
A jury is accorded wide latitude in determining the amount of non-economic damages. Hawk v. Seaboard System R.R. Inc., 547 So.2d [at] 671. For the verdict to be against the manifest weight of the evidence, evidence must be clear, obvious and indisputable. Id. Where evidence is conflicting, the weight to be given to that evidence is in the province of the jury. Hawk, at 671. The fact that a jury values wrongful death claims at a greater figure than that to which counsel had stipulated to in a related case does not justify finding improper influence upon the jury to warrant a new trial. Hawk, at 672. However, in cases where damages for mental pain and suffering is allowed, it must bear some reasonable relation to the facts, the status of the parties, the amount allowed for compensatory damages and the general trend of decisions effecting such cases. Williams v. U.S., 681 F.Supp. at 764; Florida Dairies Co. v. Rogers, 119 Fla. 451, 161 So. 85, 88 (1935).
The burden is upon the party assailing the amount of the verdict as excessive to prove that it is unsupported by the evidence or that the jury was influenced by passion or prejudice. Bould v. Touchette, 349 So.2d 1181, 1184 (Fla.1977). Where recovery is sought for a personal tort, the verdict should not be disturbed unless it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate. Id. at 1185. More than ordinary discretion is permitted juries in assessing damages for wrongful death cases. Id. A jury is not limited to considering the age and life expectancies of the deceased and dependents. Id. It can consider the health, habits, morals, social adaptability and other facts in awarding damages. Id.

Plaintiffs requested the jury to return a verdict for $10,000,000 for the mental pain and suffering of the plaintiffs. An attorney is not prohibited from suggesting to the jury the size of the damage award. Wasden v. Seaboard Coast Line R. Co., 474 So.2d 825, 831 (Fla. 2d DCA 1985).
This was a very emotional case. The parents testified as to their reaction to their daughter's death. Mrs. Goldberg currently requires medication for depression. She hyperventilates if she sees a school bus or a little girl. She has sleeping problems and she takes a sedative. She was never on antidepressants or sleeping medication before the accident. She can barely get up in the morning. She testified that it is now an empty house and that she does not do the activities that she used to do. She used to be active in horticulture, cooking classes, her own herb garden.
After the accident, she saw a psychologist for three months. With her husband, she tried grief counseling with other families which made them feel worse. She has started to read again and tries to work on her orchids, a hobby. In November she forced herself to go to the grocery store and cried on the way home. She was cooking meals again and she began driving. She attended a wedding in New York. She *1026 went to Palm Beach for Thanksgiving. She went with her husband to New Zealand, a preplanned trip. She went a couple of times to St. Maarten with her husband on business.
Dr. Goldberg testified that he is not a depressed person normally but he thinks about his daughter constantly. He starts crying when he sees a school bus. He went to therapy and it did not help. He went to grief counseling which made it worse and he stopped going. The testimony indicated that the pain and suffering of the plaintiffs was real and intense and will remain with them for their entire lives.
The medical bills were $17,012.40 and funeral services $4,281.00. The mortality tables were introduced into evidence. The mortality tables indicated that Mrs. Goldberg had a life expectancy of 30.7 and Dr. Goldberg a life expectancy of 24.5 years. Under the mortality tables, the 12-year-old decedent child would have a life expectancy of 68.2 more years. There was no testimony regarding these mortality tables. There was no evidence of the value of services or support. The child did not have any extraordinary income-producing attributes.
Defendant did not put on witnesses as to the damage amount and never disputed the plaintiffs' argument to the jury as to the amount of damages. It has not suggested what a proper amount would be to compensate the plaintiffs for the loss of their daughter. All of the plaintiffs' damage testimony went unchallenged. Defendant never disputed that Jill Goldberg was a wonderful child. It simply argued that no amount of money could bring her back. The defendant now complains about the size of a verdict which [sic] it gave the jury no evidence or argument as to what it could properly award. Despite its improper contacts with the jurors, defendant has been unable to argue any jury impropriety.
Defendant has not requested a remittitur. It wants a new trial. Defendant wants the Goldbergs to sit through another week-long trial and have another jury determine what would be a reasonable sum to compensate two parents for the loss of their eleven-year-old [sic] daughter. Presumably at this trial, defendant would now challenge the damage testimony of the plaintiffs.
The trial court observed the testimony and demeanor of Tom Scott, the U.S. Attorney, a former circuit judge and a former federal district court judge, who presided over numerous trials, including death cases. He stated that it was not going to be easy for him to testify, his hands were shaking, his voice cracking as his eyes moistened. Tom Scott did not lose his daughter. Defendant wants the Goldbergs to go through that experience again. If a new jury awards the plaintiffs their requested sum of $10,000,000, will the defendant request a third trial? What is a reasonable sum? Defendant has not suggested one to date. The court refuses to provide one. The motion is denied.
As the trial court's order thoroughly addresses the issues raised by FPL, we only give the following additional treatment to same:

A. DUTY OF CARE
FPL raises as a threshold issue, that FPL did not owe the Goldbergs a duty as a matter of law. We are unpersuaded by FPL's argument. As the trial court properly found, the evidence amply supports the jury's finding that Woodard knew or should have known that he was deliberately disabling a traffic signal.
*1027 Arenado v. Florida Power & Light, 523 So.2d 628 (Fla. 4th DCA 1988), does not support FPL's position. Here, unlike Arenado, FPL's employee took deliberate steps that he knew or should have known would turn off a traffic signal. There was no unspecified mechanical failure causing the light's outage in this case. Moreover, the FPL employee's conduct, in disabling the light, created a foreseeable zone of risk to the driving public-the Goldbergs. See Whitt v. Silverman, 788 So.2d 210 (Fla. 2001), citing McCain v. Florida Power Corp., 593 So.2d 500 (Fla.1992). FPL had a duty to exercise reasonable care to protect the motorists it placed at risk by this conduct.
In addition, as the court found based on the facts presented below, FPL assumed the duty. There was sufficient evidence from which a jury could find that FPL and the Village had reached an agreement whereby FPL would notify the Village of planned power outages. FPL breached the agreement when it did not notify authorities of the signal outage.

B. PROXIMATE CAUSATION
FPL also asserts that a directed verdict was appropriate because the collision was not foreseeable as a matter of law and, therefore, its negligence was not the cause of the death. Causation is a question of fact for the jury, unless the injury is "utterly unpredictable in light of common human experience." McCain, at 503-04. As the record demonstrates, and the trial court's order elaborates, the accident in this case was not such an unpredictable event. This case presented a classic jury issue. See Palm Beach County Bd. of County Comm'rs v. Salas, 511 So.2d 544 (Fla.1987). The court properly permitted the issue to go to the jury.
We are not persuaded that Derrer v. Georgia Elec. Co., 537 So.2d 593 (Fla. 3d DCA 1988), mandates a reversal in this case. Derrer is plainly distinguishable. Contrary to the facts in Derrer, FPL's negligence in turning off the traffic signal, which was installed to cure or ameliorate the severe conditions at this dangerous intersection, made any assessment of danger difficult for the driver to evaluate. The drivers' visibility was severely limited and the weather conditions were very adverse to proper visibility. There was no "oblivious behavior," by the drivers in this case. Moreover, the accident, caused by FPL's disabling of the traffic signal, in view of the circumstances in this case, was precisely the type of occurrence that would fall within "the scope of any fair assessment of the danger created by the inoperable traffic light." Derrer, at 594.

C. NEW TRIAL MOTION
FPL also attacks the court's denial of its new trial motion. The trial court's order proficiently dispenses with all of FPL's arguments; however, we consider each in turn.

1. ADMISSION OF EVIDENCE
We find no error in the trial court's admission of photographs depicting the concrete pad and pole. The Goldbergs did prove that the pole, as depicted in the photograph, had not changed in any way since the accident. As such, the photograph were a fair and accurate representation of the scene and the objects it depicted. Metro. Dade County v. Zapata, 601 So.2d 239 (Fla. 3d DCA 1992).
FPL's employee testified that on the date of the accident the pole was obscured by foliage. However, the photos were not rendered inadmissible by this discrepancy. The changes in the conditions shown in the photographs were explained to the jury, in an appropriate instruction. The jury was capable of understanding the changed conditions. *1028 Grant v. State, 738 So.2d 1020 (Fla. 4th DCA 1999); Musleh v. Div. of Admin., 299 So.2d 101 (Fla. 1st DCA 1974). The court did not abuse its discretion in admitting the photographs.

2. CLOSING ARGUMENT COMMENTS
FPL has not demonstrated reversible error in the court's failure to grant a new trial based on the Goldbergs' counsel's closing argument. The comment about the FPL employee, who was listed by FPL as having seen the condition of the pole on the day of the accident, was a permissible inference from the evidence. See Lowder v. Econ. Opportunity Family Health Ctr., 680 So.2d 1133 (Fla. 3d DCA 1996); Martinez v. State, 478 So.2d 871 (Fla. 3d DCA 1985). We are not persuaded that the comments were tantamount to accusing FPL of committing discovery violations.

3. ERRONEOUS ADMISSION OF TESTIMONY
FPL asserts error in permitting the Detective to testify that Mrs Goldberg operated her vehicle "in a prudent manner". The Detective was FPL's expert who had rendered various opinions as to the accident. The challenged comments were elicited on cross examination. We are not persuaded that the testimony FPL finds objectionable allowed the jury to disregard the legal standard to be applied in this case, nor did it interfere with the trial court's function of instructing the jury on the applicable law. Gulley v. Pierce, 625 So.2d 45 (Fla. 1st DCA 1993); Williams v. Dept. of Trans., 579 So.2d 226 (Fla. 1st DCA 1991).

D. COMPARATIVE NEGLIGENCE
FPL correctly asserts that under sections 316.1235, 316.123(2)(a), Florida Statutes, the drivers were required to treat the inoperative traffic light as a four-way stop. However, this does not mean that the jury was required to find the drivers negligent because of the accident.
Although violation of a traffic regulation is deemed to be evidence of negligence, deJesus v. Seaboard Coast Line R.R. Co., 281 So.2d 198 (Fla.1973), it is not negligence as a matter of law. Palm Beach County Bd. of Comm'rs v. Salas, 511 So.2d 544 (Fla.1987). Here, the jury properly heard Florida Standard Jury Instruction (Civil) 4.11, reflecting this maxim. The instruction reflects that a traffic violation does not ipso facto require a determination that the driver is negligent. The jury was within its province to find neither driver negligent.
The circumstances in this case presented the drivers with a confusing, unusual and deceiving situation. The evidence demonstrated that the intersection was exceptionally dangerous, and that Mrs. Sollie proceeded precisely as required by the statute. There was testimony that the drivers were prudent in confronting the situation presented by the scene of the accident. The jury was entitled to determine that neither driver was negligent. The trial court did not abuse its discretion in ruling that this jury finding was not against the manifest weight of the evidence and in denying the new trial motion.

E. REMITTITUR
We agree, however, with FPL's contention that the jury's damages award is excessive. The facts in this case are set forth above. In view of these facts, we find that remitting the award to ten million dollars, in total to both parents, is reasonable and not excessive. We find that this would not shock the conscience of the court, nor is it grossly disproportionate to awards in similar cases. See Hurd v. United States, 134 F.Supp.2d 745 (D.S.C.2001); *1029 Alejandre v. Republic of Cuba, 996 F.Supp. 1239 (S.D.Fla.1997). Also, the Goldbergs' trial counsel argued to the jury that ten million dollars was appropriate and FPL did not dispute this figure.
In conclusion, we affirm the judgement except for the amount of the verdict, which was excessive. We therefore remand for remittitur to ten million dollars.
Affirmed; remanded for remittitur.
GODERICH, J., concurs.
COPE, J. (specially concurring).
I am in agreement with most of the majority opinion.
Although it makes no difference to the outcome, the majority opinion is incorrect insofar as it rules that FPL's liability in this case can be based on an alleged agreement with the Village of Pinecrest. That part of the opinion is contrary to established law and the facts of this case. The only basis for imposition of liability is under common-law negligence.

I.
This is a wrongful death suit arising out of an intersection collision which occurred in the Village of Pinecrest, in Miami-Dade County, in September, 1997. The intersection in question is at Southwest 67th Avenue and Southwest 120th Street, in a busy residential area. The intersection controlled by a traffic signal.
In the afternoon, an FPL crew was repairing a downed power wire on a nearby side street. After preliminary preparations had been made, it was necessary for the FPL crew to turn off the power to a wire which was adjacent to the broken one. When the FPL lineman did this, he failed to observe that he was also switching off the power to the traffic light at the intersection some one hundred feet away.
The accident occurred at about 5:15 p.m. Although it was still light, the sky was overcast and there was a drizzly rain. When approaching the intersection from the south, an overgrowth of foliage obscured one of the two traffic signals.
Plaintiff Rosalie Goldberg was driving north bound with her daughter Jill, a twelve-year-old, in the passenger seat. Although thoroughly familiar with the intersection, Ms. Goldberg on this occasion failed to observe that she was approaching it, and did not notice that the traffic light was out. The north-south traffic was heavy, and Ms. Goldberg followed the cars ahead of her into the intersection without stopping. The traffic light at this point had been out for about one-half hour.
Ms. Cynthia Sollie was attempting to proceed eastbound on Southwest 120 Street. She had been stopped at the intersection for some time, trying to proceed across. However, the north-south traffic was not treating the intersection as a four-way stop and Ms. Sollie had not been able to go across. Believing she saw a break in the traffic, Ms. Sollie proceeded eastbound, failing to see plaintiff's car until it was in the intersection. Ms. Sollie struck the plaintiff's car, causing it to spin on the wet pavement. It car slid into the path of a southbound Chevrolet Suburban which struck the passenger door. This caused the death of Jill Goldberg.
Rosalie and Walter Goldberg brought this wrongful death action against FPL, contending that FPL had been negligent in extinguishing the power to the traffic signal. From a jury verdict in favor of the plaintiffs, FPL has appealed.[1]

*1030 II.
I agree with the majority that FPL owed a duty of care to the plaintiff under the circumstances of this case. "Where a defendant's conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon defendant either to lessen the risk or seeing that sufficient precautions are taken to protect others from the harm that the risk poses." McCain v. Florida Power Corp., 593 So.2d 500, 503 (Fla.1992) (citation omitted; emphasis in original).
In the present case the FPL crew came to the Fishbein residence which is located on a side street which intersects with 67th Avenue. Lightning had struck the overhead power wire and it had fallen into the Fishbeins' back yard. The FPL crew arrived at approximately 2:00 p.m. A circuit breaker had tripped so that the downed wire was no longer energized.
The FPL crew planned how to accomplish the repair. The planning and preparation took a little over two hours.
In order to do the repair, it was necessary to shut off the power to an adjacent power line.[2] In order to do this, an FPL lineman drove his truck from the Fishbeins' house to the corner of the side street (Southwest 122nd Drive) and 67th Avenue. He used his bucket on the truck to lift him up the pole so that he could pull the [breaker] to shut off the power at the pole.[3]
At the base of the pole is a concrete pad and a metal box cover stating ["traffic signal"]. There is a conduit which proceeds up the side of the pole. At the top of the conduit is a weatherhead from which wires are attached to the power line.
The FPL lineman testified that the pole was covered by foliage and the pad at the bottom by foliage and dead leaves. He acknowledged that he did not inspect the pole to determine what might be affected by shutting off the power. He stated that he did not notice that this power line supplied the power to the traffic signal.
The FPL lineman returned to the Fishbein residence to proceed with the repair. About one-half hour after turning the power off, the intersection collision occurred.
The plaintiff presented as an expert the recently retired Chief of the Traffic Signals *1031 and Signs Division of Metropolitan Dade County. He testified that before disconnecting the power, the pole should be inspected to determine what problems may be caused by a disconnection.[4] If the pole is covered by foliage, it is still necessary to do this inspection. Further, the expert testified that regardless of the condition of the lower part of the pole, the wires which emerge from the weatherhead are attached to the power line at an area which FPL customarily keeps clear of any overgrowth, and should have been readily observable by the FPL lineman. In any event reasonable inspection is required, even if the pole is overgrown.
According to the expert, if the lineman learns that he is about to shut off the power to a traffic signal, the power company employee should take reasonable steps to assure the safety of the intersection. This could be done by having a police officer come direct traffic.[5] Another possibility is putting flares or cones out in the road. It is also possible to call for portable stop signs from Miami-Dade County or the Village of Pinecrest.
It does not appear that FPL ever squarely contradicted the plaintiffs' expert's assertion that the foregoing is the applicable standard of care. The FPL safety officer explained that FPL relies on the fact that when a traffic light is not operating, it should be treated as a four-way stop by motorists. However, it does not appear that FPL ever established (or even attempted to establish) that the applicable standard of care allows FPL to rely exclusively on the four-way stop rule.
FPL's accident reconstruction expert acknowledged that if FPL was aware that it was turning off the power to a traffic signal, then someone should have been put in place to direct traffic. The FPL safety officer acknowledged that FPL must have due regard not only for the safety of its own workers, but for the safety of persons in the vicinity when repair work is going on. The FPL lineman testified that whether they call for someone to direct traffic depends on the circumstances, and that if he had noticed that the light was out, he likely would have called for someone to direct traffic.
The cases relied on by FPL are distinguishable. There is a general rule of nonliability where a power company negligently interrupts electric service to an area of the community and a collision results because there is no power at a traffic signal. Arenado v. Florida Power & Light Co., 523 So.2d 628 (Fla. 4th DCA 1988). If for example a power company negligently maintains a transformer, or a generator, such that power is interrupted to a whole area of the community, traffic accident liability is not imposed. See id.; see also Levy v. Florida Power & Light Co., 798 So.2d 778 (Fla. 4th DCA 2001); Martinez v. Florida Power & Light Co., 785 So.2d 1251 (Fla. 3d DCA 2001). That is because the risk of any particular automobile accident is considered to be too remote for the imposition of liability.
In the present case, however, it was necessary to shut off the power at this specific location in order to accomplish the repair. The fact that this was the power supply for the nearby traffic signal was ascertainable from inspection of the pole. There was ample time to arrange for *1032 someone to direct traffic, or to take other protective measures.
This was a busy intersection. It was rainy and overcast. The view of the traffic light was partially obscured by foliage.
I concur that there was a duty of care under McCain under the circumstances now before us.

III.
I do not agree with the part of the majority opinion which holds that there was a contractual basis for FPL's liability in this case. There is no such liability on the facts now before us or the applicable law.
The alleged "contract" is described in the following memorandum from the Pinecrest Village Manager to the members of the Village Council:
7. From 10:00 a.m. to 2:00 p.m. on August 19, 1997, a portion of the Village from Southwest 67 avenue to Southwest 124 Street was without power due to the replacement of a faulty transformer. I spoke with Greg Cope[6] with Florida Power and Light and asked if it would be possible for FPL to notify the Village in advance so that we may be able to answer resident calls. He indicated that he would notify the proper departments.
The testimony indicated that the Village had received a good many telephone calls on account of the power outage referred to in the memorandum. This transformer replacement had been scheduled in advance by FPL, and was not an emergency repair. However, FPL had not notified the Village about it, so the Village was unprepared to respond to inquiries about the power outage.
Clearly the reported discussion between the village and FPL was not a contract. It was at best a gratuitous undertaking unsupported by any consideration. And the discussion had to do with planned power outages. It made no reference to emergency service calls such as the one now before us.
The plaintiff argues that since in the present case the repair crew spent a little over two hours planning how to perform the emergency repair, this converted the emergencya downed wire and power interruptioninto a planned outage. That is not true. Within FPL parlance, the repair of a downed power wire is deemed to be an emergency from the time that FPL is notified until the time the repair is completed.
Furthermore, the alleged agreement is one running between the Village of Pinecrest and FPL, not FPL and the plaintiff. For the plaintiff to base a cause of action on this supposed contract, the agreement "must be shown to give a right of action to a member of the public not formally a party.... It must be primary and immediate in such a sense and to such a degree as to bespeak the assumption of a duty to make reparation directly to the individual members of the public if the benefit is lost." Arenado, 523 So.2d at 628-29 (quoting H.R. Moch Co. v. Rensselaer Water Co., 247 N.Y. 160, 159 N.E. 896, 897 (1928)). Obviously FPL agreed to this gratuitous undertaking as an accommodation to the Village, not to confer a cause of action on any individual.
The plaintiff argues that this oral agreement between the Village and FPL became actionable by the plaintiff under Union Park Memorial Chapel v. Hutt, 670 So.2d 64 (Fla.1996). That case states, "Voluntarily undertaking to do an act that *1033 if not accomplished with due care might increase the risk of harm to others or might result in harm to others due to their reliance upon the undertaking confers a duty of reasonable care, because it `creates a foreseeable zone of risk.'" Id. at 67 (citations omitted; emphasis added). In Union Park, a funeral home undertook to direct traffic for a funeral procession. They did so negligently, and the plaintiff was injured.
The plaintiff reasons that in this case, there was an oral agreement by FPL to notify the Village of planned power outages. Making the incorrect assumption that the agreement applied to an emergency power outage, the plaintiff now says that FPL having failed to advise the Village, this agreement becomes actionable (and avoids the limitations set forth in Arenado) because FPL had undertaken to act but failed to do so.
This analysis is faulty. In order for the gratuitous undertaking doctrine to apply, the defendant must enter into performance and act negligently in carrying out the performance. The Plaintiff's claim here is apparently that FPL should have notified the Village before shutting off the power to accomplish the repair. That is not the sort of defective performance referred to by Union Park.
This part of the majority opinion is wholly unnecessary. Since there is a common law duty to exercise due care under McCain, it does not matter whether there was a contractual duty or not. The majority's contract analysis is contrary to established precedent and unsupported by the record of this case.

IV.
I agree with the majority opinion on the issue of proximate cause, and agree that Derrer v. Georgia Electric Co., 537 So.2d 593 (Fla. 3d DCA 1988), is not controlling here. I would only add that, because the Derrer opinion does not mention any special conditions, the most logical reading of the opinion is that in Derrer the accident occurred in daylight with no visual obstructions which would limit the plaintiff's ability to see the inoperable traffic signal, and no unusual traffic conditions.
Under the facts of the present case, the traffic light was switched off at rush hour, in an overcast with a light drizzle, and with visual obstructions to the traffic light from the direction of the plaintiff's approach. Derrer is distinguishable, rather than controlling.

V.
I concur with the majority on the remaining issues.
Before SCHWARTZ, C.J., and COPE, LEVY, GERSTEN, GODERICH, GREEN, FLETCHER, and SHEVIN, JJ.

ON REHEARING EN BANC
SCHWARTZ, Chief Judge.
The court has granted FPL's motion for rehearing en banc on the ground that the panel decision departs from the court's prior decisions in (a) Martinez v. Florida Power & Light Co., 785 So.2d 1251 (Fla. 3d DCA 2001), review granted, 819 So.2d 137 (Fla.2002), and (b) Metropolitan Dade County v. Tribble, 616 So.2d 59 (Fla. 3d DCA 1993), review denied, 626 So.2d 210 (Fla.1993); Metropolitan Dade County v. Colina, 456 So.2d 1233 (Fla. 3d DCA 1984), pet. for review denied, 464 So.2d 554 (Fla. 1985); and Derrer v. Georgia Electric Co., 537 So.2d 593 (Fla. 3d DCA 1988), review denied, 545 So.2d 1366 (Fla.1989), so that en banc review is "necessary to maintain uniformity in the court's decisions." Fla. R.App.P. 9.331(a). We adhere to each of these decisions. On the merits, viewing, as required, the facts set out in the panel *1034 opinions in the light most favorable to the plaintiffs below, we conclude, on two separate grounds each of which is independently sufficient to require the result, that their case fails as a matter of law. We hold:
No Duty. Under Martinez, of which we entirely approve, the power company owed no common law duty and, for the reasons in part III of Judge Cope's specially concurring opinion, no "contractual" duty to the decedent to maintain current in the traffic light in question.
No Legal Cause. Even if the contrary were true, under Tribble, Colina, and Derrer, no negligence with respect to the operation of the traffic light could have been a legal or proximate cause of the accident because it was causally superseded by the actions of the drivers actually involved in the collision.
Because therefore, neither of the indispensable elements, see Florida Power & Light Co. v. Lively, 465 So.2d 1270, 1273 (Fla. 3d DCA 1985), review denied, 476 So.2d 674 (Fla.1985); 38 Fla.Jur.2d Negligence § 16 (1998), to the maintenance of a negligence claimbreach of duty and legal causationexists as a matter of law on this record, the defendant's motions for directed verdict in its favor should have been granted.[1]
The judgment below is therefore reversed with directions to enter one for the defendant instead.
Reversed and remanded.
LEVY, GERSTEN, GREEN and FLETCHER, JJ. concur.
COPE, J. (dissenting from opinion on rehearing en banc).
I adhere to the views I previously expressed in my special concurrence to the panel opinionwith one exception. While I would uphold the determination that FPL has liability for this accident, I would remand for a new trial on the comparative fault of FPL and the two motorists, Ms. Goldberg and Ms. Sollie.
Common experience tells us that when a traffic light is extinguished, motorists frequently disobey the rule that the traffic light is to be treated as a four-way stop. The rule is disobeyed with great frequency where the road is heavily traveled, as was true in this case.
The evidence supports the proposition that FPL knew, or reasonably should have known, this. Further, the evidence supports the jury's conclusion that FPL knew, or reasonably should have known, that in disconnecting the power at the nearby pole, it was extinguishing the traffic light as well.
"If an intervening cause is foreseeable the original negligent actor may still be held liable. The question of whether an intervening cause is foreseeable is for the trier of fact." Gibson v. Avis Rent-A-Car System, Inc., 386 So.2d 520, 522 (Fla.1980) (citations omitted); see also McCain v. Florida Power Corp., 593 So.2d 500, 503 (Fla.1992); Palm Beach County Bd. of County Comm'rs v. Salas, 511 So.2d 544, 547-48 (Fla.1987).
While the negligence of Ms. Goldberg and Ms. Sollie was foreseeable, it was nonetheless negligence. It cannot be true that 100% of the responsibility is shifted to FPL. The Goldberg vehicle entered the intersection without stopping. The Sollie *1035 vehicle entered the intersection when the way was not clear. The verdict assigning all of the responsibility to FPL was against the manifest weight of the evidence, and a new trial should be ordered solely on the issue of comparative fault. See Morera v. Castellon, 716 So.2d 318 (Fla. 3d DCA 1998); Pierce v. Nicholson Supply Co., 676 So.2d 70 (Fla. 2d DCA 1996); Kinsey v. Kelly, 312 So.2d 461 (Fla. 1st DCA 1975); Clarke v. Stewart, 579 So.2d 281 (Fla. 3d DCA 1991).
SHEVIN, J. (dissenting from opinion on rehearing en banc).
I respectfully dissent and would adhere to the original panel opinion for the reasons stated therein.
GODERICH, J., concurs.
NOTES
[1] It is clear the plaintiff tried the case on the theory that FPL negligently shut off the power to the traffic signal. In that connection, it is necessary to clarify a sentence in the majority opinion (adopting a statement in the trial court's order) that "[T]his intersection collision occurred when the traffic signal was intentionally rendered inoperable to conduct non-emergency repairs." Majority opinion at 1015-16.

What the trial court meant by that sentence was that FPL intentionally switched off the power at the pole. There was no claim that FPL actually knew that it was switching off the power to the traffic signal. Instead, the plaintiff's theory was that the FPL lineman should have inspected the pole to determine what was being switched off, before pulling the breaker.
At trial, FPL requested a jury instruction that one of the issues was "whether [FPL] knowingly and intentionally interrupted the power supply to the traffic signal...." Plaintiff opposed this jury instruction, arguing that the actual theory of the case was that FPL had been negligent. The trial court then rejected FPL's instruction.
[2] This was because it was still possible for there to be what FPL called "backfeed," by which power could travel from the remaining active power wire through the transformer and back into the downed wire. An FPL crew person had recently been killed under such circumstances on another repair job. Thus, it was necessary to cut the power to the adjacent wire in order to have the repair performed safely.
[3] The majority opinion misspeaks when it says, "As you climbed the pole, you could see the wires run from the pole to the traffic light." Majority opinion at 1012. There was no testimony that the FPL lineman climbed the pole. He used the bucket lift instead of climbing the pole.
[4] The expert made reference to the National Electrical Safety Code.
[5] The Pinecrest police had already responded to the downed power wire. However, after FPL inspected the downed wire, FPL advised the police that their services would not be needed, so they left.
[6] No relation to the this writer.
[1] Our disposition to this effect makes it unnecessary to reach or consider any of the multiple grounds raised by FPL in support of its claims for a new trial or remittitur. For that reason, we vacate the panel's holdings and discussion of those issues.