899 So.2d 1105 (2005)
Walter GOLDBERG, etc., et al., Petitioners,
v.
FLORIDA POWER & LIGHT COMPANY, Respondent.
No. SC03-1942.
Supreme Court of Florida.
April 7, 2005.
*1107 Joel D. Eaton of Podhurst Orseck, P.A., Miami, FL and Stuart Grossman of Grossman and Roth, P.A., Boca Raton, FL, for Petitioner.
Gary L. Sasso and Hunter W. Carroll of Carlton Fields, P.A., St. Petersburg, FL and Aimee Fried, FPL Law Department, Miami, FL, for Respondent.
*1106 LEWIS, J.
We have for review Florida Power & Light Co. v. Goldberg, 856 So.2d 1011 (Fla. 3d DCA 2002), which expressly and directly conflicts with this Court's decision in Martinez v. Florida Power & Light Co., 863 So.2d 1204 (Fla.2003). We have jurisdiction. See art. V, § 3(b)(3), Fla. Const. As more fully discussed further herein, we quash the decision of the Third District *1108 Court of Appeal and remand the case for reinstatement of the remitted final judgment as initially ordered by that court.

BACKGROUND AND FACTS
The instant action arises from a decision of the Third District Court of Appeal reversing a judgment entered against Florida Power & Light (FPL) in connection with the wrongful death action concerning the death of the Goldbergs' 12-year-old daughter, Jill Goldberg. FPL terminated power to a traffic light which resulted in a motor vehicle collision and the resulting death. Initially, a Third District panel affirmed the trial court's order denying FPL's alternate motions for directed verdict and a new trial, but determined that the $37 million in damages awarded by the jury was excessive, and remanded the case for remittitur to $10 million. Thereafter, sitting en banc, the Third District Court of Appeal reversed the initial panel's decision and remanded the case with instructions to direct a verdict and enter judgment in favor of FPL. We quash this decision and reinstate the decision of the original Third District panel.
The Goldbergs' action arose from a traffic accident that occurred in the Village of Pinecrest on Friday, September 12, 1997, shortly after 5 p.m., which resulted in their daughter's death. Much earlier that day, weather had caused an electric line to come down in the rear of the Fishbein residence, a private home located on a side street (Southwest 122nd Drive), which intersects with 67th Avenue in Pinecrest. The Fishbein residence is a large, walled home with a motorized gate in front. The concerned homeowner notified law enforcement and Officer Laricci of the Pinecrest police department responded to the scene at approximately 2 p.m. Ray Woodard, an FPL repairman, who had responded to a call from the same residence approximately two weeks before this date, also responded and established that there was no power flowing through the downed line at this location. Shortly after Woodard arrived on the scene, the Fishbeins left the residence. At approximately 3 p.m., FPL through Woodard informed Officer Laricci that he was no longer needed at the scene and that he could leave the area.
Ultimately FPL dispatched six trucks and seven repair personnel to the Fishbein residence and immediate area. To prevent an occurrence referred to as "back-feed," the FPL crew determined that they should deactivate power on an adjacent line which was connected to the same utility pole as the downed line. To accomplish this task, the crew decided to de-energize the adjacent line by opening a fuse on the utility pole which was located near the Fishbein property, and positioned approximately 100 to 150 feet from the traffic light that controls the intersection of Southwest 67th Avenue[1] and 120th Street, a major intersection in Pinecrest. At 4:42 p.m., Woodard proceeded to the utility pole in question, opened the fuse and terminated power to the parallel line, rendering the traffic signal totally inoperable. Despite numerous contrary factors, Woodard claimed that he did not actually know that the fuse also controlled the traffic signal at this intersection.
Jill Goldberg was a passenger in a car driven by her mother, Rosalie Goldberg. Shortly after 5 p.m., the Goldbergs were traveling north on 67th Avenue following a line of vehicles, none of which were stopping at the inoperable traffic light deactivated by FPL at the intersection of 67th and 120th. Cynthia Sollie, who had traveled eastbound on 120th Street, stopped her Ford Expedition at this inoperable *1109 traffic light in an eastbound direction on 120th Street, but pulled out slowly onto 67th Avenue, attempting to find an opening in the flowing line of traffic proceeding along 67th Avenue on this rain-filled afternoon. Sollie's vehicle clipped the left rear of the Goldberg vehicle, causing it to rotate and slide in a northbound direction, into the southbound lane of travel on 67th Avenue. The Goldberg's vehicle was moving sideways at the time and was impacted on the passenger side by a Chevy Suburban traveling southbound on 67th Avenue. Jill Goldberg was immediately airlifted from the intersection to the trauma center at Jackson Memorial Hospital where she died the next day.
Walter Goldberg and Rosalie Goldberg, as personal representatives of the Estate of Jill Goldberg, filed this action seeking damages from FPL for wrongful death and negligence. The complaint alleged, in pertinent part,[2] that FPL had a duty not to create a hazardous condition at the subject intersection by terminating power without providing for traffic control, or warning the appropriate governmental authorities or motorists when it was reasonably foreseeable that harm would occur absent traffic control. The Goldbergs contended that as a result of FPL's breach of this duty, traffic proceeded through the intersection in an uncontrolled manner and Jill Goldberg was killed. FPL countered that it had no common law duty to the general public for the operation of traffic signals.
After a week-long trial, the jury found for the plaintiffs, awarding the Goldbergs approximately $37 million in damages. The jury verdict form reflected a finding of negligence on the part of FPL which was the legal cause of Jill Goldberg's death, and no negligence attributable to either Cynthia Sollie or Rosalie Goldberg. Pertinent to the instant analysis, FPL requested the entry of a directed verdict in its favor. The trial court denied the motion, concluding that "ample evidence" had been presented that Woodard, FPL's agent, should have known that he was de-energizing the source of electrical power to the traffic signal, and that FPL's failure to provide any type of warning concerning the intentional power interruption and the dangerous condition resulting at the intersection created a "reasonable foreseeable zone of risk to others" which gave rise to a duty to warn affected motorists. On the issue of proximate causation, the trial court distinguished and refused to apply a line of cases generated within the Third District holding that a driver's negligence in failing to treat an inoperable signal as a four-way stop as required by Florida law always constitutes an intervening superseding cause as a matter of law relieving the original negligent actor of liability.
A three-judge panel of the Third District affirmed the trial court's refusal to direct a verdict. However, the Third District sitting en banc reversed the decision of the initial district court panel. Issuing a brief opinion, the district court at that time relied solely on its decision in Martinez *1110 v. Florida Power & Light Co., 785 So.2d 1251 (Fla. 3d DCA 2001), which this Court has since quashed based on later developing authority, see Martinez, 863 So.2d at 1205, to conclude that FPL owed no common law duty whatsoever to Jill Goldberg. The district court also invoked district precedent and determined that no negligence with respect to the operation of the traffic light could have been the legal or proximate cause of the accident because it was causally superseded as a matter of law by the actions of the drivers involved in the collision. Having determined that the Goldbergs could satisfy neither the duty nor proximate cause elements of their negligence action, the split en banc court concluded that FPL's motion for directed verdict should have been granted and a corresponding judgment entered. We granted jurisdiction in the matter, see Goldberg v. Fla. Power & Light Co., 870 So.2d 821 (Fla.2004) (table), and the instant review followed.

ANALYSIS

Legal Duty
The determination of the existence of a duty of care in a negligence action is a question of law. See McCain v. Fla. Power Corp., 593 So.2d 500, 502 (Fla. 1992). "The duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader `zone of risk' that poses a general threat of harm to others." Id. at 502. A duty may arise from multiple sources: "(1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case." Clay Elec. Coop., Inc. v. Johnson, 873 So.2d 1182, 1185 (Fla.2003) (quoting McCain, 593 So.2d at 503 n. 2). The present case falls within the fourth category  the duty, if it exists, would arise from the general facts of the case. Moreover, because the instant matter involves a motion by FPL for a directed verdict with an adverse jury verdict established, we must view the facts in the light most favorable to the non-moving party, the Goldbergs. See Irven v. Dep't of Health & Rehab. Servs., 790 So.2d 403, 407 (Fla.2001). Every "reasonable conclusion which may be drawn from the evidence" must also be construed favorably to the Goldbergs, and only where there is "no evidence upon which a jury could properly rely" in finding for the Goldbergs should FPL's motion for a directed verdict be granted. Id. at 406 n. 2 (quoting Stokes v. Ruttger, 610 So.2d 711, 713 (Fla. 4th DCA 1992)).
In denying FPL's motion for a directed verdict, the trial court determined that FPL had a common law duty to warn of the hazardous situation it created when the company intentionally terminated the flow of power which rendered the traffic signal inoperable. In response to FPL's argument that the repairman, Woodard, did not realize he was deactivating the traffic signal, the trial court determined that there was "ample" evidence that he should have known that the wiring on the pole directly powered the traffic light. In affirming that decision, the initial district court panel determined that "FPL's employee took deliberate steps that he knew or should have known would turn off a traffic signal," and that his action "created a foreseeable zone of risk to the driving public  the Goldbergs." Goldberg, 856 So.2d at 1027. The district court initially concluded that "FPL had a duty to exercise reasonable care to protect the motorists it placed at risk by this conduct." Id.
We agree that the facts of this case establish that FPL's actions created a foreseeable zone of risk encompassing the motorists utilizing the intersection within *1111 this 100 to 150 feet of the critical location at 67th and 120th, and gave rise to a legal duty to warn motorists of the hazardous condition it created by deactivating the traffic signal. See McCain, 593 So.2d at 503 ("[T]he trial and appellate courts cannot find a lack of duty if a foreseeable zone of risk more likely than not was created by the defendant.").[3] As found by the trial court, there was ample evidence that Woodard should have known that opening the fuse on the utility pole to prevent backfeed to the downed line would terminate power to the traffic signal. Woodard admitted that he knew opening the fuse would cause a power outage "in the area." He also admitted that from his position at the utility pole, he had an unobstructed view of the traffic signal at 67th and 120th, which was no more than 150 feet away. Woodard testified that he did not actually look in the direction of the signal, but that testimony was undermined by evidence showing that Woodard made two trips to the utility pole on the day of the accident during which he would have had a clear view of the traffic signal in question.[4] Indeed, the Goldbergs' traffic signal expert testified that from where Woodard was positioned he should have even seen the traffic light go dark when he terminated power to the parallel line.
Moreover, the utility pole itself had several characteristics clearly disclosing that the power for the traffic signal flowed from that location. There was a distinctive concrete slab measuring five feet by five feet at the base of the pole with a metal plate in the center of it marked "Traffic Signal." Woodard confirmed that had he seen the concrete slab and metal plate, he would have known that the wiring on the pole controlled the traffic signal. There was also a gray box located eight *1112 feet up the pole which contained a breaker for the traffic signal. Sheldon Pivnik, the former chief of traffic signals and signs for Dade County, testified that a conduit ran from the signal breaker to the top of the pole where it was connected to FPL's power lines, and that it was a "typical installation" uniformly identifiable as a service point for the traffic signal. Woodard testified that on the day of the collision he did not inspect the pole or its base, and asserted that his view of the pole and base was obstructed by trees and leaves. According to Pivnik, however, Woodard should have inspected the utility pole prior to disconnecting power, regardless of whether the pole was covered by foliage.
The record also demonstrates that FPL had the capacity to institute even the most minimal of safety procedures prior to terminating power to the traffic signal. When Woodard arrived on the scene at the Fishbein residence, a uniformed officer from the Pinecrest police was also present. This officer could have and would have easily assisted in making the intersection safe for travel, but Woodard advised the officer that he was no longer needed at the scene. Even in the officer's absence, FPL itself had more than ample, experienced personnel on the scene who were equipped with the items necessary to warn motorists of the inoperable traffic light. Upon analysis, the company had dispatched six trucks and seven repair people to this scene. Woodard, who himself had 32 years' experience with FPL, testified that on the day of the collision, he actually had beacons, hazard lights, flashing beacons, and portable two-way hand radios in his truck, none of which was ever employed and all of which remained unused.
The facts clearly show without conflict that FPL also had sufficient time to initiate some necessary safety measures on the day of the accident. Woodard arrived on the scene at 2:45 p.m., and confirmed that the downed line on the Fishbein property was not an immediate threat because there was absolutely no power running through it at that time. The traffic signal was not deactivated until 4:42 p.m., leaving the intervening two hours for the multiple crews to ascertain the possible ramifications of intentionally terminating power to the parallel line as part of the repair, and to implement some corresponding appropriate safety measures.
The record also reflects that proper safety procedures would have called for FPL to simply notify the local authorities that it had or intended to de-power a traffic signal or take some small steps to warn affected motorists or both. Expert testimony indicated that FPL should have and could have taken any of several minimal steps prior to deactivating the traffic signal, including simply notifying the local police department, placing cones or flares on the road, or notifying the public works department of the need for portable stop signs. As Judge Cope correctly stated in his opinion specially concurring with the initial district court decision, "It does not appear that FPL ever squarely contradicted the plaintiff's expert's assertion" regarding the applicable standard of care. Goldberg, 856 So.2d at 1031.[5] Even FPL's senior safety specialist agreed that even in an unplanned outage situation, an FPL employee would have an obligation to protect the public from the hazardous situation created when he knows his actions will terminate power to a traffic signal.
*1113 Finally, the weather added to the hazardous driving conditions which were present at the time of the collision. The accident occurred during the evening rush hour on a rainy, overcast day. The FPL crew should have reasonably factored such conditions into determining how to proceed with the needed repair work. See Clay Electric, 873 So.2d at 1187 (determining that the company should have reasonably foreseen that proper maintenance of the street lights was necessary for the protection of the plaintiffs where the street light was located in a residential area along a major roadway that served as the pathway for a bus stop without the benefit of sidewalks). This trap for the motoring public was created within 100 to 150 feet from the source of the intentional de-energizing act.
An analogous question was presented in Palm Beach County Board of Commissioners v. Salas, 511 So.2d 544 (Fla.1987), in which this Court was asked to determine whether a county work crew could be held liable for failing to take reasonably necessary steps at a maintenance site to protect the safety of passing motorists. In that case, a survey crew had blocked a left turn lane, rendering the left turn signal perpetually red. See id. at 545. The crew failed to post signs prohibiting left turns from the remaining lanes. See id. A woman who attempted to turn from the far right lane collided with the plaintiffs in the intersection. See id. This Court held that the work crew had a duty to carry out its maintenance responsibilities in a non-negligent manner, and had a duty to warn the motoring public of any known hazards that the presence of the work crew, blocking of the turn lane, and accompanying deactivation of the turn signal had created. See id. at 547.
A similar conclusion was reached by the First District in Robinson v. State Department of Transportation, 465 So.2d 1301 (Fla. 1st DCA 1985). There, the DOT had blocked the left turn lane to repaint arrows on the roadway, and thereby rendered the automatic light activator inoperable. See id. at 1302. The district court reversed the entry of a partial summary judgment in favor of the DOT, determining that genuine issues of material fact remained regarding whether the DOT carried out its maintenance responsibilities in a non-negligent manner. See id. at 1304. Important to the court's determination was the fact that one of the drivers involved in the accident saw no caution signs, the posting of which was required by the DOT safety manual. See id.; see also City of St. Petersburg v. Collom, 419 So.2d 1082, 1086 (Fla.1982) (holding that governmental entities may be held liable for failing to provide the necessary warning or correction of a known dangerous condition).
Applying those principles to the instant matter supports the conclusion that FPL had a clear duty to warn motorists of the hazardous situation it created by the deactivation of the traffic signal at the intersection of 67th and 120th. As in Salas and Robinson, an entity  here FPL  engaged in an affirmative action that rendered a single, perceptible traffic signal inoperable. Just as in those cases, this action by FPL agents created a hazardous condition and a foreseeable zone of risk for the motorists utilizing the affected intersection. FPL was thus subject to a duty to use reasonable care in perfecting this repair and at least warn motorists of the hazardous situation it had created.
FPL urges, however, that it has no common law duty to the public at large whatsoever to maintain the flow of electricity to traffic signals, and that any "duty to warn" argument is essentially and necessarily the flip side of the same coin in that it seeks to hold FPL liable for the consequences of the cessation of power to the signal. Essentially, *1114 FPL posits that there is no distinction between the asserted nonexistent duty to the public to maintain the flow of electricity to traffic signals in Pinecrest and the duty to warn of interrupted service. FPL misapprehends the issue and misstates the duty issue. FPL relies on an inapplicable line of cases in which some courts facing different facts have refused to impose a common law duty on electric utilities to ensure the supply of electricity to street lights and traffic signals. See Arenado v. Fla. Power & Light Co., 523 So.2d 628 (Fla. 4th DCA 1988) (determining that the utility company had not assumed a duty to the general public to ensure supply of electricity to traffic signals); Gin v. Yachanin, 75 Ohio App.3d 802, 600 N.E.2d 836 (1991) (concluding that no duty to the general public emanates from the power company's contract with the local government to provide service to traffic signals and street lights); see also Martinez v. Fla. Power & Light Co., 785 So.2d 1251, 1253 (Fla. 3d DCA 2001) (concluding that the public is only an incidental beneficiary to electric company's agreement with the local government to maintain streetlights), quashed, 863 So.2d 1204 (Fla.2003) (quashing district court decision and remanding for consideration in light of decision in Clay Electric); Levy v. Fla. Power & Light Co., 798 So.2d 778, 780 (Fla. 4th DCA 2001) (determining that power company does not owe a duty to a noncustomer injured because its negligence rendered a traffic signal inoperable), notice invoking discretionary review filed, No. SC01-2786 (Fla. Dec. 17, 2001).[6]
However, the rule established in those cases has no application here, where after determining that no imminent threat existed, an FPL employee chose a deliberate hazardous repair action that he knew or should have known would deactivate a single, nearby, in-sight traffic signal, which controlled a very active intersection, without taking at least some minimal precautions to make safe the resulting hazard. The cases cited by FPL simply reflect the established principle that the power company should not be held responsible every time power to a traffic signal ceases, a concept with which we do not disagree. Certainly, in the event of an emergency mechanical failure, FPL may not know, or know in a timely manner, that service to a traffic signal has been interrupted. Similarly, in a large-scale power outage attendant to a hurricane or other act of God, numerous traffic signals may be deactivated rendering it impractical for FPL to implement safety precautions at all affected intersections. Likewise, an FPL repairman faced with a truly emergent threat, such as downed live wires, may be forced to rapidly deactivate electric lines that power traffic signals without the time or resources to implement safety precautions.
This case does not, however, present one of those scenarios. Nor does FPL's attempt *1115 to define the issue meet the facts here. An FPL repairman acted in a deliberate manner that rendered a single, clearly perceptible traffic signal inoperative as part of the repair process. Evidence demonstrates that the repair work with which he was faced was not truly an emergency. The downed line which generated the need for repair was de-energized and located on a private residence that was unoccupied at the time of the incident and inaccessible to any passers by. The decision to open the fuse on the utility pole  a decision that resulted in the termination of power to the traffic signal and the creation of a danger and enhanced zone of risk  was made to effectuate the repair of the downed line, not to cut power to live lines that would have posed a danger to anyone in the area. Indeed, it is difficult to reconcile the existence of an imminent threat to the public from the de-energized downed line with Woodard's decision to wait two hours before deactivating the parallel line. Finally, Woodard was not forced to handle this situation alone. With six trucks and seven employees, FPL had ample resources already on the scene to initiate at least some minimal necessary safety procedures.
Under the facts of this case, it is perfectly reasonable to conclude that FPL owed a duty to warn affected motorists of the danger created and posed by the inoperable traffic signal. The evidence presented at trial indicated that to satisfy a reasonable standard of care would have required FPL to notify the police department, place road flares, direct traffic, or take some other precautions reasonably necessary to alert and protect the safety of passing motorists. Having performed none of these even elementary precautionary measures, FPL breached its duty.
According to FPL, the sole duty it undertook in the instant matter was to repair the downed power line and it was free to do so in any manner it selected without regard to the consequences. It asserts that this Court cannot impose upon the company a duty "once removed" from the duty FPL undertook to complete the restoration work in this case. FPL further asserts that foreseeability alone is insufficient to create a legal duty, and that a special relationship between it and Jill Goldberg is necessary for imposition of a duty. In support of that proposition, FPL cites a string of cases in which the duty to warn or make safe dangerous conditions arose from the special relationship between the parties or the defendant's assumption of the duty in question.
FPL's argument simply ignores the well-established principle that in fulfilling its duty to repair the downed electric wire, it assumed the duty to do so in a non-negligent manner. See Salas, 511 So.2d at 547; Robinson, 465 So.2d at 1304; see also Union Park Mem. Chapel v. Hutt, 670 So.2d 64 (Fla.1996) (determining that once a funeral director undertook to lead a funeral procession, he assumed a minimal duty to ensure that the procession proceeded safely); Sommers v. Smith & Berman, P.A., 637 So.2d 60 (Fla. 4th DCA 1994) (concluding that a title company acting as a closing agent has a duty to conduct the closing in a reasonably prudent manner). The company cannot viably argue that its duty to warn of a dangerous condition it created in the course of making the repair is "one step removed" from its original duty to repair the line. Such a theory would unconscionably allow FPL to take any and all actions it desired to dispense with its maintenance and repair duties, regardless of the consequences. For instance, as the Goldbergs respond, had the repair necessitated the excavation of a large ditch in the center of 67th Avenue, the law would not insulate FPL from liability for the failure to properly mark the hazard on the basis that its duty *1116 ended with digging the ditch to effectuate the repair, and that any steps to warn oncoming drivers would be "one step removed" from its legal duty. The same logic applies here. Under the facts presented, FPL owed a legal duty to warn the motorists traversing the intersection of 67th and 120th that it had deactivated the traffic signal.

Proximate Causation
The issue of proximate cause is generally a question of fact concerned with "whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred." McCain, 593 So.2d at 502; see also Florida Power & Light Co. v. Periera, 705 So.2d 1359, 1361 (Fla.1998). This Court has stated that "harm is `proximate' in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." McCain, 593 So.2d at 503. The proper question is whether the individual's conduct is "so unusual, extraordinary or bizarre (i.e., so `unforeseeable') that the policy of the law will relieve the [defendant] of any liability for negligently creating this dangerous situation." Salas, 511 So.2d at 547. In this Court's words, "The law does not impose liability for freak injuries that were utterly unpredictable in light of common human experience." McCain, 593 So.2d at 503. Where reasonable persons could differ as to whether the facts establish proximate causation, the issue must be left to the fact finder. See id. at 504.
A negligent actor such as FPL is not liable for damages suffered by an injured party "when some separate force or action is the active and efficient intervening cause" of the injury. Gibson v. Avis Rent-A-Car Sys., Inc., 386 So.2d 520, 522 (Fla.1980) (internal quotation marks omitted). Such an intervening cause supersedes the prior wrong as the proximate cause of the injury by breaking the sequence between the prior wrong and the injury. However, "[i]f an intervening cause is foreseeable the original negligent actor may still be held liable." Id. The question of whether an intervening cause is foreseeable is for the trier of fact. See id. In reaching this determination, the question is "whether the harm that occurred was within the scope of the danger attributable to the defendant's negligent conduct." Id. (determining that a reasonable person would conclude that stopping a car on a multilane highway would create a risk that other cars would collide in an effort to avoid impacting the stopped vehicle); see also Vining v. Avis Rent-A-Car Sys., Inc., 354 So.2d 54 (Fla.1977) (determining that it was reasonable to foresee the theft of an automobile left unattended with the keys in the ignition in a high crime area and the increased danger of injury to those using the highways should such theft occur).
In overturning the jury's determination in the instant matter and directing that a verdict and judgment be entered in favor of FPL, the Third District majority sitting en banc determined that even if FPL owed a legal duty to Jill Goldberg, the company's negligence could not have been the proximate cause of the accident because it was "causally superseded by the actions of the drivers actually involved in the collision." Goldberg, 856 So.2d at 1034. The Third District provided no analysis of the facts undergirding its conclusion on the proximate cause issue, but simply cited to a line of its own cases in which it had relieved the initial tortfeasors of liability as a matter of law due to the plaintiffs' negligence in failing to treat inoperable traffic signals as four-way stops as required by Florida law.
*1117 This principle was first articulated in Metropolitan Dade County v. Colina, 456 So.2d 1233 (Fla. 3d DCA 1984). There, the husband of a woman killed in an intersectional collision filed a negligence action against Dade County for the County's failure to repair traffic signals rendered inoperable by a storm or place temporary traffic control signals at the affected intersections. See id. at 1234. The evidence in that case showed that as Colina approached the intersection, he stopped his vehicle, noticed two vehicles approaching to his left, realized that the vehicles might not stop, yet still decided to cross the intersection. See id. The Colinas' vehicle was struck by one of the oncoming vehicles, resulting in Mrs. Colina's death. See id.
The district court there held that the county's failure to repair the traffic signal was not the proximate cause of the collision because the actions of the drivers constituted intervening causes. Citing section 316.1235 of the Florida Statutes (1979), which required drivers to treat an inoperable traffic signal as a four-way stop, the district court stated that the oncoming driver failed to stop as required by law, and that Colina had breached his duty to proceed into the intersection only when reasonably safe to do so. See id. at 1235. On this basis, the district court concluded, "Any negligence on Dade County's part simply provided the occasion for the actions of [the drivers], which together were the proximate cause of Mrs. Colina's death." Id. The district court concluded that reasonable persons could not differ on the question of whether the county's failure to act was the proximate cause of Mrs. Colina's death and that, as a matter of law, the county's negligence was not the legal cause of the injury suffered.
The Third District reached a similar conclusion in Derrer v. Georgia Electric Co., 537 So.2d 593 (Fla. 3d DCA 1988), another case involving an intersectional collision. While it is not entirely clear from the text of the opinion itself, one of the drivers involved in the collision apparently asserted that she did not see the intersection where the collision occurred due to the inoperable traffic signal. In determining that the inoperable signal was not the proximate cause of the collision, the district court reasoned that inoperable intersectional traffic lights do not cause automobile drivers to miss seeing the intersection where the light is located. See Derrer, 537 So.2d at 594. Most recently, in Metropolitan Dade County v. Tribble, 616 So.2d 59 (Fla. 3d DCA 1993), the Third District held that a cab driver's decision to disobey the rules governing the treatment of malfunctioning traffic lights constituted a "separate and unusual action rendering it a superseding and intervening cause of the accident." Id. at 60.
To the extent Colina, Derrer, and Tribble establish that a plaintiff's negligence in entering an uncontrolled intersection always constitutes an intervening and superseding cause as a matter of law, these cases are misdirected and in error. Any such bright-line rule would contravene the well-settled principle that the issue of proximate cause, including whether there exists an intervening and superseding cause, is primarily a question of fact, and that when the facts are in dispute, the issue must be left to the fact finder. See Vining, 354 So.2d at 55 (reversing summary judgment and stating that jury must ultimately determine whether it was reasonable for Avis to foresee the theft of a car and resulting danger to the driving public when the car was left in the company's parking lot with the keys in the ignition). Indeed, juries in similar contexts have rightly determined that a plaintiff's negligence in negotiating an intersection *1118 or roadway does not necessarily constitute an intervening and superseding cause relieving the initially negligent party such as FPL of liability. See, e.g., Gibbs v. Hernandez, 810 So.2d 1034 (Fla. 4th DCA 2002) (reversing summary judgment granted on the basis that a driver's decision to negotiate an obscured turn constituted an intervening and superseding cause relieving the contractor who placed concrete pipes near the intersection of liability); Dykes v. City of Apalachicola, 645 So.2d 50 (Fla. 1st DCA 1994) (reversing trial court's conclusion that driver's negligence in hitting a pedestrian constituted an intervening and superseding cause relieving the city of liability for allowing foliage to grow into the right-of-way); Grier v. Bankers Land Co., 539 So.2d 552 (Fla. 4th DCA 1989) (reversing trial court determination that overgrown foliage adjacent to an intersection could not as a matter of law constitute the proximate cause of an accident). Yet, the Third District relied on Colina, Derrer and Tribble to summarily conclude that FPL's negligence in failing to warn affected motorists of the danger could not have been the proximate cause of the accident because it was causally superseded by the negligence of Rosalie Goldberg and Cynthia Sollie.
In denying FPL's motion for a directed verdict, the trial court correctly reviewed the record evidence and determined that the accident was an entirely foreseeable consequence of FPL's negligence in creating a dangerous condition of deactivating the traffic signal. See Goldberg, 856 So.2d at 1018. In initially affirming the trial court's decision, the original district court panel determined that the accident in the instant matter was not an "unpredictable event" and presented a "classic jury issue." Id. at 1027. We agree with this analysis. If an intersection is controlled by a traffic signal, it is usually because the intersection is heavily traveled, has line of sight obstructions, or has some other physical characteristic that renders stop signs or other traffic control devices impractical. Thus, in the course of human events, it is certainly foreseeable that drivers approaching an intersection with an inoperable traffic light will fail to stop, despite the traffic law requiring drivers to treat the inoperable signal as a four-way stop. See § 316.1235, Fla. Stat. (2003). This is especially true in a case such as this in which the drivers approached an inoperable traffic signal at a busy intersection, during the rush hour, in inclement weather, and where traffic proceeded in one direction in an almost unbroken band.[7]
Our decision in Salas is particularly instructive on the proximate cause issue presented here. In that case, the Court considered whether the driver's decision to make a left turn from the far right lane *1119 (an action which violated two traffic laws), superseded the county's negligence in blocking the left turn lane without providing any markers or guidance regarding the inability to turn left at the intersection. See Salas, 511 So.2d at 547. In the Court's words:
We are of the view, and we so hold, that the county could have easily foreseen that blocking off the turn lane, and deactivating the turn signal and thus leaving motorists with no guidance on if or when they could turn left, personal injury to someone was not a remote possibility. Blount's actions were not so unforeseeable that the county should be relieved, as a matter of law and policy, of all liability.... Blount's confusion at this busy and now more dangerous intersection was not some remote possibility, it was easily foreseeable. The fact that Blount was negligent when she turned left does not render her action so bizarre, unusual or outside the realm of the reasonably foreseeable that the county's actions did not also proximately cause the Salases' injuries.
Id.
Similarly, here, the failure of a motorist to stop at the intersection of 67th and 120th was not "so bizarre, unusual or outside the realm of ... reasonably foreseeable" behavior to relieve FPL of liability for deactivating the traffic signal without taking any precautions whatsoever to warn oncoming motorists. This is particularly true where, as here, the collision occurred during rush hour at a busy intersection on rain-slicked streets when the Goldbergs were traveling in a line of northbound traffic in which no car stopped at the inoperable light. Under the circumstances of this case, it was entirely foreseeable that motorists might not stop their vehicles at the inoperable traffic signal.
Likewise, under the facts presented here, Cynthia Sollie's negligence in pulling out onto 67th Avenue does not constitute an intervening and superseding cause that would relieve FPL of liability. Evidence established that Sollie was aware of the inoperable signal and brought her vehicle to a stop as required by Florida's traffic law. Sollie testified[8] that she looked to her right and left prior to proceeding into the intersection and saw no cars. This testimony is supported by that of experts for both sides who noted the existence of line of sight obstructions at the subject intersection.[9]
While certainly not factors within FPL's control, the rain, the overcast skies, and the line of sight obstructions could be perceived by anyone in proximity of the intersection that day, including Woodard, and should have informed FPL's decision with regard to how the repair work would be accomplished. Indeed, while begrudgingly, FPL's accident reconstruction expert even testified that if the light had been operational, or if someone had been in place to direct traffic, the accident probably would not have happened. When viewed in light of the facts of the case, the negligence displayed by Rosalie Goldberg and Cynthia Sollie cannot be characterized as intervening and superseding causes as a matter of law totally relieving FPL of its responsibility for breaching its duty of care by creating the danger and zone of enhanced risk. This is a case where reasonable persons could certainly differ as to *1120 the issue of proximate causation, and therefore, the issue was within the proper province of the fact finder. Either the Colina line of cases establishes an erroneous rule of law, or the en banc court erred to the extent it interpreted these cases as creating an absolute bright-line rule governing the proximate cause question presented in cases where the plaintiff displays negligence in entering an intersection with an inoperable traffic signal.

CONCLUSION
For the foregoing reasons, we quash the en banc decision of the Third District Court of Appeal and remand the case for reinstatement of the initial district court decision. We disapprove Colina, Derrer, and Tribble to the extent described herein.
PARIENTE, C.J., and ANSTEAD, QUINCE, CANTERO, and BELL, JJ., concur. WELLS, J., concurs in result only with an opinion.
WELLS, J., concurring in result only.
I concur in the result reached by the majority in this case. However, I do not join in the majority's opinion because I do not agree that the duty on the part of Florida Power & Light Company (FPL) in this case was a duty to warn of the danger of the traffic lights being out. The motorists driving through this intersection had a duty to know whether the traffic light was working, § 316.1235, Fla. Stat. (1997), and to observe the requirements of section 316.123(2), Florida Statutes (1997), if the traffic light was inoperative. FPL had no duty to otherwise warn them about the light being inoperative.
Moreover, whether the traffic light was operative was open and obvious, and a failure to warn about that fact did not cause this accident. The record facts here are that Ms. Goldberg proceeded into the intersection without observing the light but, rather, only observed that the traffic ahead of her was moving forward. Ms. Sollie apparently did observe that the traffic light was out.
I agree with Judge Cope's analysis in the district court panel's decision:
In the present case, however, it was necessary to shut off the power at this specific location in order to accomplish the repair. The fact that this was the power supply for the nearby traffic signal was ascertainable from inspection of the pole. There was ample time to arrange for someone to direct traffic, or to take other protective measures.
Florida Power & Light Co. v. Goldberg, 856 So.2d 1011, 1031-32 (Fla. 3d DCA 2002) (Cope, J., specially concurring). Under the circumstances of this case, since FPL should have known that it was cutting off the traffic control at the intersection, FPL had a duty, in accord with McCain v. Florida Power Corp., 593 So.2d 500 (Fla.1992), to provide emergency traffic control either until law enforcement arrived to provide traffic control or until the traffic light was operable. Contrary to footnote 3 of the majority opinion, I would hold only that this was the duty which FPL had under the circumstances of this case. My conclusion follows McCain, 593 So.2d at 503 n. 2, which states that a duty can arise from the facts of the case. My view is no more extensive than that holding in McCain.
I agree with the majority that the issue of whether FPL's failure to provide traffic control was a proximate cause of the accident was for the jury. I conclude that the negligence of the motorists under these facts was joint and not an intervening cause. Again, I agree with Judge Cope in his dissenting opinion to the en banc district court decision that the issue in this *1121 case was the comparative fault of FPL and the two motorists.[10]
NOTES
[1] This section of 67th Avenue is also known as "Ludlam Road."
[2] The complaint also alleged that FPL had represented to the Manager of the Village of Pinecrest that the company would notify the local government whenever it intended to terminate power to a portion of the Village, and thus assumed the duty to provide such advance notice. FPL countered that it owed no contractual duty to warn the Village of Pinecrest because the traffic signal was inadvertently deactivated during the performance of emergency restoration work, not during a scheduled power outage. Our decision rests on FPL's common law duty to warn, and, consequently, we will not address whether or not FPL also had assumed an additional duty to notify the Village of Pinecrest of the power outage.
[3] The concurring opinion does not agree that FPL had a duty to warn of the danger created by its disabling of the traffic light, and instead concludes that the company had the far greater singular duty to actually provide emergency traffic control until law enforcement arrived or until the traffic light was operable. We acknowledge that in the instant matter FPL certainly would have been capable of providing emergency traffic control given the number of FPL personnel on scene, the training they received in traffic direction, and the equipment they had on hand to facilitate such measures. We cannot agree, however, that all such scenarios impose a singular duty to provide actual emergency traffic control as opposed to adequately warning affected motorists of the hazard created by a dangerous condition. One facing similar circumstances may adequately address the hazardous situation it created by employing any number of measures along a spectrum, some of which  such as the placement of road flares or the prior notification of local authorities  may obviate the duty to engage in actual traffic control. The essential problem in this case is that FPL did nothing, despite its employee's constructive knowledge of the hazard posed by his affirmative act.

As explained in greater detail in this opinion, one who undertakes an action assumes the duty to perform the action non-negligently. See Union Park Mem. Chapel v. Hutt, 670 So.2d 64 (Fla.1996) (determining that once a funeral director undertook to lead a funeral procession, he assumed a minimal duty to ensure that the procession proceeded safely). On that basis, we are reluctant to impose a greater singular duty to provide actual emergency traffic control, and the liability that flows from that duty, in a situation such as this. The better rule in a case such as this is to impose a duty to use reasonable care which may, depending on all relevant factors, require providing traffic control, but on other occasions sufficient warning to alert affected motorists of the hazardous situation created when the actor disabled the traffic light.
[4] First, Woodard walked to the pole, and opened the fuse for the downed line to ensure that it was de-powered. On this trip, he would have had an unobstructed view of the then-functioning traffic signal. Woodard returned to the pole in his bucket truck to pull the second fuse to deactivate the parallel line. Again, from his position, he would have had a clear view of the then-inoperable signal.
[5] Judge Cope further stated that FPL never established that the applicable standard of care would allow the company to rely exclusively on the provision of the Florida Statutes requiring drivers to treat inoperable traffic signals as four-way stops. See Goldberg, 856 So.2d at 1031.
[6] Clay Electric relied on many of the same cases in arguing that it owed no duty to maintain the street light at issue in that case. Arenado and many of the other cases cited above rely on the principle articulated in H.R. Moch Co. v. Rensselaer Water Co., 247 N.Y. 160, 159 N.E. 896 (1928), in which the New York court held that the water company's agreement to supply water to the city did not create a duty to the public at large to ensure an adequate supply of water to city fire hydrants. This Court has distinguished the cases that relied upon Moch, stating that Moch was issued at a time when the undertaker's doctrine was nascent and the courts did not have the benefit of modern authority pertaining to the "increased risk" and "reliance" factors of the undertaker's doctrine, and that Moch appeared to adopt reasoning applicable to cases involving the installation as opposed to the maintenance of fire hydrants. See Clay Electric, 873 So.2d at 1188-89.
[7] Pinecrest's traffic homicide detective testified to the commonality of this situation, stating:

I'm sure you've driven down the road, and I do every day, that when there's a light out, the flow of traffic that's going when the light is out continues to go as long as the cars are consistent.
If the oncoming section gets a break in traffic or one of the drivers, you know, decides that he's going to break the chain, he nudges up until they gain possession of the lane and then they go until the other side gets a break.
That's the way it is here. It's been like that for sixteen years. The law was written many years ago. The intersections today  I mean it's just not practical.
If we shut down the light at 104th Street or anywhere along South Dixie, four lanes in each direction, you're not going to have at rush hour especially, 5 o'clock when this happened, four cars stop, four cars go.
It's just not going to happen. It's going to be chaotic. That's why police officers are put in intersections because there's no control.
[8] Sollie's deposition testimony was read into the record.
[9] FPL's own accident reconstruction expert testified that if Sollie was stopped at the stop bar to the intersection, her view would have been obstructed, and there would have been only a "crack" of viewability in the direction from which the Goldbergs were traveling.
[10] FPL did not raise in this Court an issue of whether a new trial should have been granted on the issue of comparative negligence.